Sally A. **DORNBERGER**, on behalf of herself and all other persons similarly situated, Plaintiff,

v.

**METROPOLITAN LIFE INSURANCE COMPANY**, et al., Defendants.

No. 95 Civ. 10374(LBS).

United States District Court, S.D. New York.

March 27, 1997.

512

Quinn, Marantis & Rosenberg, L.L.P., White Plains, NY (Timothy C. Quinn, Jr., Bradford D. Conover, of counsel), for Plaintiff.

Proskauer, Rose, Goetz & Mendelsohn, L.L.P., New York City (Bruce E. Fader, of counsel), for MetLife Defendants.

Adler, Pollock & Sheehan, Inc., Providence, RI (John A. Tarantino, Mark O. Denehy, of counsel), for Defendant Vito Vitone.

Folkenflik & McGerity, New York City (Margaret McGerity, of counsel), for Defendant M.S. Peress.

## OPINION

SAND, District Judge.

Plaintiff Sally A. Dornberger brings this action on behalf of herself and all others similarly situated[1] against Metropolitan Life Insurance Company ("MetLife"), two corporate affiliates of MetLife, and various employees, officers, and directors of MetLife (collectively "Defendants"). Plaintiff alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, as well as several state law claims. Defendants move to dismiss on various grounds. For the reasons set forth below, Defendants' motion is granted in part and denied in part.

---

1. The question of class certification has yet to be addressed.

## I.

## BACKGROUND

The following factual account is taken entirely from Plaintiff's amended complaint and RICO Statement, the contents of which are assumed true for purposes of this motion.

MetLife, a New York-based insurance company, began selling insurance policies in Europe in 1957, pursuant to an agreement with the United States Army and Air Force which allowed MetLife to sell policies to military personnel and their families. RICO Statement ("Stmt.") at 62. Unbeknownst to the military, and in violation of military regulations, MetLife began to solicit American citizens residing in various European nations who were not connected to the military, as well as European nationals. *Id.* Plaintiff, a British citizen residing in Switzerland, purchased two insurance policies from MetLife, one in 1991 and one in 1993, insuring the life of her husband, Paul G. Dornberger, an American also residing in Switzerland. Am. Compl. ¶ 4. The gravamen of Plaintiff's complaint is that MetLife's European solicitations and the sales which they produced from the 1950's to the 1990's were in violation of the insurance laws of various European nations. Plaintiff alleges that Defendants were aware of this illegality, and in fact took active steps to conceal the illegal sales in order to avoid detection.

The alleged scheme, referred to by Plaintiff as the "Overseas Operation," was carried out through the recruitment and training of European sales representatives. These representatives, unaware of the alleged illegality of MetLife's activities, worked from their homes in Europe where they "blended in" so as to avoid detection by European authorities.[2] *Id.* ¶ 56. Detection was also avoided through multiple relocations of the Overseas Operation's offices, through frequent changes in procedures, and through fraudulent statements in New York State tax returns. *Id.* ¶¶ 57, 73.

The alleged scheme was carried out through a pattern of fraudulent representa-

tions and omissions made by means of telephone marketing, mailings, advertisements, and face-to-face solicitations of prospective purchasers. *Id.* ¶¶ 60, 67. In the course of these communications, Defendants fraudulently failed to disclose that MetLife's insurance sales in Europe were in violation of European laws and that MetLife had never received the proper authorizations from European regulators to sell insurance. RICO Stmt. at 8. Also, Defendants fraudulently represented that local representatives would be stationed permanently in Europe to provide personal servicing on MetLife policies, with the cost of such servicing included in the premiums to be paid to MetLife. *Id.* at 6, 8–9. The permanent service was not provided—MetLife terminated the local representatives in 1994, allegedly in an attempt to avoid detection of MetLife's illegal sales by European authorities. Am. Compl. ¶¶ 98–106. Defendants also fraudulently represented that a 2.6% New York State franchise tax was required to be paid on all policies, and that the premiums paid by overseas purchasers would cover that tax, when in fact the tax was never paid to New York authorities. RICO Stmt. at 7–8. Defendants also fraudulently represented that the policies sold in Europe were "New York Policies" "as good as any such policies available in New York," and that the policies would be covered by the protections of New York insurance law, including the New York State guaranty fund to cover policies in the event of insurer insolvency, when in fact the policies were not covered by the New York guaranty fund. *Id.* at 6, 8.

MetLife terminated its Overseas Operation in 1994–95, following various occurrences which made the illegality of MetLifes activities apparent. Am. Compl. ¶¶ 87–112. In 1989, a MetLife sales representative was arrested in Switzerland. *Id.* ¶ 91. Later, British insurance regulators discovered MetLife's illegal sales and instructed MetLife to comply with applicable British regulations. *Id.* ¶ 88. In 1994, Swiss regulators informed MetLife sales representatives that MetLife's

---

2. Some of these sales representatives filed an action against MetLife which is currently before this court, *Cular v. Metropolitan Life Ins. Co.,* 95

Civ. 5250(LBS). Pending motions in that action were decided in a separate opinion issued today.

sales in Switzerland were illegal. *Id.* ¶ 95. MetLife placed several of its European sales representatives on "administrative leave" in 1994, and eventually terminated them. *Id.* ¶¶ 98–106.

Plaintiff discovered the alleged fraudulent conduct of Defendants in October, 1995, and demanded that MetLife provide confirmation that her policies carried the same protections as all valid and legal insurance policies. *Id.* ¶ 179. When MetLife failed to provide assurances as to the legality of the policies, the availability of guaranty fund protection, or the availability of local service representatives, Plaintiff ceased paying premiums and her policies lapsed. *Id.* ¶ 180.

Plaintiff filed this action in December, 1995 on behalf of all persons, excluding New York residents, who purchased polices through MetLife's Overseas Operation from 1957 forward. Plaintiff's complaint as amended asserts various claims, including RICO violations, rescission for illegality, rescission and damages for fraud, breach of contract, breach of fiduciary duty, negligent misrepresentation, and claims under N.Y. Ins. Law §§ 2123, 4224 and 4226 (McKinney 1985 & Supp.1997) and N.Y. Gen. Bus. Law § 349 (McKinney 1988).

## II.

### DISCUSSION

#### A. *Standard for Motion to Dismiss*

█ In addressing a motion to dismiss we are required to construe any well-pleaded factual allegations in the complaint in favor of the plaintiff and to dismiss the complaint only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Gagliardi v. Village of Pawling,* 18 F.3d 188, 191 (2d Cir.1994) (citation omitted). Our function is not to weigh the evidence that might be presented at trial, but merely to determine whether the complaint itself is legally sufficient. *Festa v. Local 3 Int'l Bhd. of Elec. Workers,* 905 F.2d 35, 37 (2d Cir. 1990). Our consideration is limited to "the factual allegations in plaintiffs' . . . complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993). In addition, we may consider the factual allegations in Plaintiff's RICO Statement in supplement to the complaint. *McLaughlin v. Anderson,* 962 F.2d 187, 189 (2d Cir.1992); *Pier Connection, Inc. v. Lakhani,* 907 F.Supp. 72, 74 n. 4 (S.D.N.Y.1995).

#### B. *RICO Claims*

Defendants move to dismiss Plaintiff's RICO claims on several grounds. First, Defendants contend that application of RICO is barred by the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.* (the "McCarran Act"). Second, Defendants contend that the amended complaint fails to allege a RICO injury within the meaning of 18 U.S.C. § 1964(c). Third, Defendants contend that the amended complaint fails to state a claim for a RICO violation under 18 U.S.C. §§ 1962(a), (b), (c), or (d). Fourth, Defendants contend that the amended complaint fails to plead predicate acts of fraud with particularity as required by Federal Rule of Civil Procedure 9(b). We address each of these contentions in turn.

#### 1. The McCarran Act

The McCarran Act provides in pertinent part:

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . .

15 U.S.C. § 1012(b). The McCarran Act was intended to permit the states to regulate the business of insurance "free from inadvertent preemption by federal statutes of general applicability." *Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co., Inc.,* 50 F.3d 1486, 1488–89 (9th Cir.), *cert. denied sub nom.* —— U.S. ——, 116 S.Ct. 418, 133 L.Ed.2d 335 (1995). The first section of the

McCarran Act makes clear the purpose of Congress:

Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1011. As stated by the Supreme Court, "[o]bviously, Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 429, 66 S.Ct. 1142, 1155, 90 L.Ed. 1342 (1946).[3] Congress accomplished this purpose by reversing the normal rules of preemption, creating "a clear-statement rule ... that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise." *Fabe,* 508 U.S. at 507, 113 S.Ct. at 2211.

■ Courts have established a four-part test to determine whether the McCarran Act precludes application of a federal statute. Under this test a federal statute is precluded if: (1) the statute does not "specifically relate" to the business of insurance; (2) the acts challenged under the statute constitute the "business of insurance"; (3) the state has enacted laws regulating the challenged acts; and (4) the state laws would be "invalidated, impaired, or superseded" by application of the federal statute. *Merchants,* 50 F.3d at 1489.[4] We now apply this test.

a. "Specifically relates"

■ The parties do not dispute that RICO does not "specifically relate" to the business of insurance. *See Kenty v. Bank One,* 92 F.3d 384, 391 (6th Cir.1996) (stating that RICO does not specifically relate to the business of insurance); *Merchants,* 50 F.3d at 1489 (same).

b. "Business of insurance"

■ Defendants contend that the acts which Plaintiff alleges—illegal and fraudulent sales of insurance policies—constitute the "business of insurance." Plaintiff contends that Defendants' illegal and fraudulent activities, conducted outside the reach of insurance regulators, do not legitimately constitute the "business of insurance."

The term "business of insurance" is not defined in the McCarran Act. However, the Supreme Court has set forth a clear standard:

The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder.

*SEC v. National Secs., Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 568–69, 21 L.Ed.2d 668 (1969). In light of this focus, the Court has

---

**3.** For a more thorough discussion of the purpose and background of the McCarran Act, see *United States Department of the Treasury v. Fabe,* 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993).

**4.** At least one court has read the McCarran Act to establish a three-part test rather than a four-part test, which inquires: (1) whether the federal statute "specifically relates" to the business of insurance; (2) whether the state has enacted laws "for the purpose of regulating the business of insurance"; and (3) whether application of the federal statute would "invalidate, impair or supersede" such state laws. *See Ambrose v. Blue Cross & Blue Shield of Va., Inc.,* 891 F.Supp.

1153, 1158 (E.D.Va.1995), *aff'd,* 95 F.3d 41 (4th Cir.1996). However, the majority of courts have utilized the four-part test set forth above. *See. e.g., Merchants,* 50 F.3d at 1489; *Espinoza v. Union Sec. Life Ins, Co.,* No. 1:95–cv–453–MHS, 1996 WL 380702, at *2 (N.D.Ga. Jan.24, 1996); *Moore v. Fidelity Fin. Servs., Inc.,* 884 F.Supp. 288, 290 (N.D.Ill.1995); *Everson v. Blue Cross & Blue Shield of Ohio,* 898 F.Supp. 532, 543 (N.D.Ohio 1994); *Sabo v. Metropolitan Life Ins. Co.,* No. 94–307, slip op. at 4 (W.D.Pa. Nov. 10, 1994); *Wexco, Inc. v. IMC, Inc.,* 820 F.Supp. 194, 198 (M.D.Pa.1993); *Brownell v. State Farm Mut. Ins. Co.,* 757 F.Supp. 526, 534–35 (E.D.Pa.1991). We follow the majority approach.

set forth three factors to assess whether a particular practice constitutes the "business of insurance": (1) whether the practice "has the effect of transferring or spreading a policyholder's risk"; (2) whether the practice "is an integral part of the policy relationship between the insurer and the insured"; and (3) whether the practice "is limited to entities within the insurance industry." *Fabe,* 508 U.S. at 497–98, 113 S.Ct. at 2206.

Various courts have held that acts of fraud or misrepresentation in connection with the sale of insurance policies come within the purview of the "business of insurance" under the Supreme Court's standard. *See, e.g., Espinoza,* 1996 WL 380702, at *3; *Pinski v. Adelman,* No. 94 C 5783, 1995 WL 669101, at *4–*6 (N.D.Ill. Nov.7, 1995); *Everson,* 898 F.Supp. at 543–44; *Sabo,* slip op. at 5–8; *Wexco,* 820 F.Supp. at 199–200; *Gordon v. Ford Motor Credit Co.,* 868 F.Supp. 1191, 1194–96 (N.D.Cal.1992); *LeDuc v. Kentucky Cent. Life Ins. Co.,* 814 F.Supp. 820, 827–28 (N.D.Cal.1992). These courts have reasoned that the Supreme Court's three-factor test is satisfied in such circumstances because the sale of insurance policies is the vehicle by which a policy relationship is created and by which risk is transferred, and the sale of policies is a practice which is, of course, unique to the insurance industry. We agree with the reasoning of these cases. Nothing is more the "business of insurance" than the solicitation of customers to purchase policies.

Two district courts have taken the contrary view, espoused by Plaintiff here, that fraudulent or otherwise illegal acts can never constitute the "business of insurance." *See Thacker v. New York Life Ins. Co.,* 796 F.Supp. 1338, 1342 (E.D.Cal.1992); *Washburn v. Brown,* No. 81 C 1475, 1986 WL 7062, at *4 (N.D.Ill. June 17, 1986). However, this view has been rejected by more recent opinions, including those of the Ninth Circuit and the Seventh Circuit, which encompass the *Thacker* and *Washburn* district courts. The Ninth Circuit in *Merchants* specifically rejected the *Thacker* approach, reasoning that such a narrow view would "read the McCarran–Ferguson Act out of existence," because "[a]ny practice which violated any federal statute would, by definition, not be the 'business of insurance,' resulting in all

federal statutes applying to the business of insurance with their full vigor." *Merchants,* 50 F.3d at 1490. Similarly, the Seventh Circuit rejected an argument that racial discrimination in the issuance of policies is not the "business of insurance," reasoning that "it is not helpful to point to a practice forbidden by federal law ... and observe that this practice is not itself insurance." *NAACP v. American Family Mut. Ins. Co.,* 978 F.2d 287, 294 (7th Cir.1992); *see also Avery v. Schmidt,* No. Civ. A 93–4079, 1995 WL 562302, at *4 (E.D.La. Sept.20, 1995) (rejecting argument that wrongful acts cannot be the "business of insurance"). We agree that it is inappropriate to conclude that illegal conduct can never be part of the "business of insurance." Rather, the proper approach is to apply the Supreme Court's three-factor test on a case-by-case basis.

We thus conclude that the alleged conduct of Defendants comes within the purview of the "business of insurance."

### c. State law

The parties do not dispute that the State of New York has enacted laws to regulate the type of conduct which Plaintiff alleges. *See* N.Y. Ins. Law § 4226 (prohibiting misrepresentations and misleading statements as to the terms and benefits of insurance contracts).

### d. "Invalidate, impair, or supersede"

■ Defendants contend that application of RICO would "invalidate, impair or supersede" New York insurance law because RICO provides a different remedial and enforcement framework than New York law. In particular, there are four differences between causes of action under RICO and causes of action under New York insurance law which in Defendants' view demonstrate that a RICO action would invalidate, impair, or supersede New York law: 1) the availability of treble damages under RICO; 2) the availability of attorney's fees under RICO; 3) the availability of class actions under RICO; 4) different statutes of limitation. Plaintiff contends that RICO would not invalidate, impair, or supersede New York law because private actions for insurance fraud are available under New York law as well as under

RICO, and Plaintiff asserts that mere differences in remedy are not sufficient to preclude application of a federal statute.

This issue has resulted in a split among those courts which have addressed it. Some courts have adopted a "direct conflict" approach, which holds that a federal statute which prohibits the same conduct as state law does not "invalidate, impair, or supersede" state law, regardless of differences in procedure or remedy. This approach has been adopted by the Ninth Circuit, *see Merchants*, 50 F.3d at 1491–92; the Seventh Circuit, *see American Family*, 978 F.2d at 295–97 (assessing whether Fair Housing Act is precluded by McCarran Act); the First Circuit, *see Villafane–Neriz v. FDIC*, 75 F.3d 727, 736 (1st Cir.1996) (assessing whether FDIC regulations are precluded by McCarran Act); and various district courts, *see, e.g., Brownell*, 757 F.Supp. at 536. This approach reasons that state and federal laws which are substantively alike but differ in penalty do not conflict with or displace each other, but merely supplement each other. *See American Family*, 978 F.2d at 297; *Brownell*, 757 F.Supp. at 536. Thus, under this approach, a federal law will "invalidate, impair, or supersede" state law only if it "prohibit[s] acts permitted by state law, or vice versa." *Merchants*, 50 F.3d at 1492. As the Ninth Circuit has indicated, the basis for this approach is that the McCarran Act was not intended to cede *all* regulatory power over the insurance business to the states:

> The language of [the McCarran Act] is inconsistent with a congressional intent to allow states to preempt the field of insurance regulation. First, [the Act's] exemption of federal laws which specifically relate to the business of insurance weighs

against a congressional intent wholly to abandon the field to the states. Second, only federal statutes which "invalidate, impair, or supersede" state insurance statutes are "preempted." If Congress had intended to cede the field, it could have said: "No federal statute shall be construed to apply to the business of insurance." Instead, it allowed federal statutes to apply unless they conflict with the state statutes....

*Id.*

Other courts have adopted what may be termed an "upset the balance" analysis, which holds that a federal law may "invalidate, impair, or supersede" state law based solely on the existence of greater remedies under the federal law, even if the federal law and the state law are alike in terms of the substantive conduct which they prohibit. This approach has been adopted by the Eighth Circuit, *see Doe v. Norwest Bank Minn., N.A.*, 107 F.3d 1297, 1307 (8th Cir. 1997); the Sixth Circuit, *see Kenty*, 92 F.3d at 392;[5] the Fourth Circuit, *see Ambrose*, 95 F.3d at 41 (affirming *Ambrose*, 891 F.Supp. 1153); and by various district courts, *see, e.g., Espinoza*, 1996 WL 380702, at *3–*4; *Everson*, 898 F.Supp. at 544–45; *Wexco*, 820 F.Supp. at 202–04; *Senich v. Transamerica Premier Ins. Co.*, 766 F.Supp. 339, 340–41 (W.D.Pa.1990). Courts taking this approach have typically been faced with state insurance laws which did not provide for private rights of action, leading these courts to conclude that private suits under RICO would disrupt the administrative enforcement procedures established by state law. *See, e.g., Ambrose*, 891 F.Supp. at 1165; *Everson*, 898 F.Supp. at 544. The typical reasoning of

---

**5.** The Sixth Circuit's *Kenty* decision appears to adopt the "upset the balance" approach, but, upon closer reading, this decision can be read consistently with the Ninth Circuit's "direct conflict" approach. *Kenty* held that RICO would "invalidate, impair, or supersede" Ohio insurance law, in part because RICO allows treble damages. *Kenty*, 92 F.3d at 392. However, the opinion also noted that Ohio law automatically prohibited certain auto insurance rebates which were at issue, while RICO would have required a showing of fraud or other illegal predicate act. *Id.* Hence, as applied to the facts of that case, RICO and Ohio law conflicted not only in reme-

dy, but also in terms of their *substantive* reach. Furthermore, *Kenty* cited but did not overrule a prior Sixth Circuit case, *Nationwide Mutual Insurance Co. v. Cisneros*, 52 F.3d 1351, 1363 (6th Cir.1995), which held that the Fair Housing Act did *not* "invalidate, impair, or supersede" state law simply by virtue of the fact that the Fair Housing Act allows private suits and punitive damages, which state law did not allow. Hence, upon a close reading of these cases, it appears that the Sixth Circuit has not in fact adopted a pure "upset the balance" approach, but has instead adopted an approach more akin to that of the Ninth Circuit.

these cases was set forth by Judge Payne of the Eastern District of Virginia:

> RICO, which authorizes private causes of action, treble damages and attorneys fees is a powerful weapon in the arsenal of any litigant. Application of RICO to afford redress for violations of Chapter 5 [of Virginia insurance law], would invalidate and impair the regulation sought to be accomplished by Chapter 5 ... Most aggrieved insureds would opt for the prospect of treble damages rather than participate in remedial measures structured by the SCC [State Corporation Commission]. This would make insurers less willing to agree with the SCC to settle disputes over alleged violations for fear of compromising their positions in pending or threatened RICO litigation ... The prospect of treble damages and attorneys fees would weaken, diminish and do serious injury to, if not nullify, the sections of Chapter 5, and the enforcement mechanisms which protect and regulate that relationship.
>
> ... Because RICO provides for a private cause of action and treble damages, and because these provisions of RICO differ dramatically from the way in which Virginia's insurance code addresses the same conduct, RICO would in effect replace Chapter 5 as the principal means by which to remedy such conduct. It would convert a system of public redress into a system of private redress....

*Ambrose*, 891 F.Supp. at 1165.

No court within the Second Circuit has addressed this issue. Our conclusion that application of RICO would not "invalidate, impair, or supersede" New York insurance law is therefore a matter of first impression in this Circuit.

Initially, we note that in virtually all of the "upset the balance" cases, the state regulatory schemes at issue did not provide for private rights of action by aggrieved insureds, but instead placed the duty of enforcement upon an administrative body. *See, e.g., Ambrose*, 891 F.Supp. at 1165; *Everson*, 898 F.Supp. at 544; *Wexco*, 820 F.Supp. at 203–04. The reasoning of these cases was based partly on the notion that private RICO actions would disturb the limited administrative enforcement procedures established by the respective state legislatures. *See Ambrose*, 891 F.Supp. at 1165 (stating that private RICO actions would "convert a system of public redress into a system of private redress."); *Wexco*, 820 F.Supp. at 204 (concluding that private RICO actions would "upset the balance of relationships" between insurers and insureds under Pennsylvania's administrative enforcement scheme). By contrast, New York insurance law expressly permits private rights of action by insureds who are the victims of fraud. *See* N.Y. Ins. Law § 4226(d). Thus, the "upset the balance" cases are distinguishable. Private RICO actions in New York will not disturb any delicate "balance" in which administrative enforcement is the sole means chosen by the state to enforce its insurance regulations.[6]

Defendants point out that the availability of private actions under New York insurance law can also cut the other way. Defendants reason that, because New York has specifically provided for private actions, this evinces an intent on the part of the New

---

**6.** Though the courts in these "upset the balance" cases were faced with state insurance regulations which allowed no private right of action, some of these courts noted that private plaintiffs could sue insurers under the state's *common law* of fraud. *See, e.g., Everson*, 898 F.Supp. at 544. Yet, courts such as *Everson* still held that private RICO suits would "invalidate, impair, or supersede" state law. Such courts concluded that, even in light of the availability of common law suits, RICO's treble damages and attorney's fees provisions would so entice plaintiffs that RICO would replace state law (statutory or common law) as the chosen vehicle to remedy insurance fraud. *See id.* (noting that "common law fraud actions 'do not reward plaintiffs with treble damages, costs, and attorney fees mandated by RICO.'" (quoting *Wexco*, 820 F.Supp. at 204)). *But see Thacker*, 796 F.Supp. at 1342–43 (concluding that RICO would *not* "invalidate, impair, or supersede" state law, in light of availability of private actions under state common law). Thus, courts such as *Everson* presumably would hold RICO to be barred regardless of whether state insurance regulations prohibit or allow private actions. Nevertheless, because we conclude that RICO's greater remedies do not serve to "invalidate, impair, or supersede" state law, we cannot accept the reasoning of such cases.

York Legislature to create a thorough set of remedies, leaving no room for RICO suits. However, as the Ninth Circuit reasoned in *Merchants,* the McCarran Act was not intended to cede the entire field of insurance regulation to the states. *See Merchants,* 50 F.3d at 1492. Rather, the McCarran Act precludes application of federal statutes if, and only if, those statutes "invalidate, impair, or supersede" state law. We cannot conclude that RICO would "invalidate, impair, or supersede" state law where both RICO and state law recognize private actions as a proper means to remedy fraud.

■ We accept the reasoning of the Ninth Circuit and those other courts which have adopted the "direct conflict" approach. We agree that a federal law which can be used to punish the same substantive conduct as state insurance law does not "invalidate, impair, or supersede" state law. Rather, such a federal law tends only to *supplement* state law by providing another vehicle by which to carry forth the substantive policies which both the federal and state laws will further. The fact that the federal law may have more flexible procedures or greater remedies is not dispositive. Rather, application of the greater federal remedies tends to further the policies which the federal and state laws share.

Of course, there is some sense in which application of a federal law with different procedures or greater remedies may disrupt state law, simply by virtue of the fact that the federal law may punish defendants more often or to a greater extent than the state law allows. The Seventh Circuit recognized this fact in *American Family:*

> Undoubtedly there is a sense in which any overlap between state and federal law upsets a balance struck by one of the two legislatures ... One could say that a federal rule increasing the probability that a state norm will be vindicated (or augmenting the damages assessed in the event of violation) conflicts with a decision by the state that remedies· should be limited or rare.

*American Family,* 978 F.2d at 295. Nevertheless, the Seventh Circuit concluded that this fact does not require a conclusion that such a federal law "invalidates, impairs, or supersedes" state law. *See id.* at 295 (stating that "[d]uplication is not conflict."). We agree with this approach.

Our conclusion is further bolstered by Supreme Court and Second Circuit precedent. In *National Securities, supra,* the Supreme Court held that the McCarran Act did not bar an action by the SEC challenging a merger between two insurance companies, even though state insurance authorities had approved the merger. *National Secs.,* 393 U.S. at 457–64, 89 S.Ct. at 567–71. The Court concluded that application of federal securities laws would not "invalidate, impair, or supersede" state insurance law because the policies of the federal and state laws were compatible:

> It is clear that any "impairment" in this case is a most indirect one. The Federal Government is attempting to protect security holders from fraudulent misrepresentations; Arizona, insofar as its activities are protected by the McCarran–Ferguson Act from the normal operations of the Supremacy Clause, is attempting to protect the interests of the policyholders. *Arizona has not commanded something which the Federal Government seeks to prohibit.* It has permitted respondents to consummate the merger; it did not order them to do so. In this context, all the Securities and Exchange Commission is asking is that insurance companies speak the truth when talking to their shareholders. *The paramount federal interest in protecting shareholders is in this situation perfectly compatible with the paramount state interest in protecting policyholders* ... In these circumstances, we simply cannot see the conflict.

*Id.* at 463, 89 S.Ct. at 570 (emphasis added). This language hints at an approach which recognizes that a federal law which embraces policies that are compatible with state law does not "invalidate, impair, or supersede" state law.

■ Furthermore, the Second Circuit, though it has not addressed the precise question of the applicability of the McCarran Act in the RICO context, has indicated that the McCarran Act is to be narrowly construed,

especially in areas of "national concern." In *Spirt v. Teachers Insurance and Annuity Association,* 691 F.2d 1054 (2d Cir.1982), *vacated on other grounds,* 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), the Second Circuit held that the McCarran Act did not preclude application of Title VII, reasoning that the McCarran Act was not intended to bar enforcement of federal policies "in such fields as civil rights, labor and other areas of national concern." *Id.* at 1066; *see also Stephens v. National Distillers and Chem. Corp.,* 69 F.3d 1226, 1231 (2d Cir.1996) (noting that prior Second Circuit case law "at the very least, recommends a narrower reading of the [McCarran Act].""). Racketeering activity, at which RICO is aimed, is an area of "national concern," albeit of a different nature than civil rights. Following these precedents, we favor a narrower application of the McCarran Act's preclusive effect.

We therefore conclude that the McCarran Act does not bar Plaintiff's RICO claims.

### 2. RICO injury

Defendants seek dismissal of Plaintiff's RICO claims on the ground that Plaintiff has failed to plead injury within the meaning of 18 U.S.C. § 1964(c).

■■■ A RICO claim requires proof of three things: (1) a violation of one of the substantive provisions of 18 U.S.C. § 1962; (2) an injury within the meaning of § 1964(c); and (3) that the injury is proximately caused by the violation. *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 767 (2d Cir.1994). Under § 1964(c), a plaintiff must be "injured in his business or property" in order to recover. This requires a showing of some actual, out-of-pocket financial loss. *Id.* at 768; *Commercial Union Assurance Co. v. Milken,* 17 F.3d 608, 612 (2d Cir.1994). Injuries that are speculative or unprovable in nature or amount are not recoverable—recovery must wait until the nature and extent of damages becomes "clear and definite." *Gelt,* 27 F.3d at 768; *Cruden v. Bank of N.Y.,* 957 F.2d 961, 977 (2d Cir.1992). "Causes of action for future damages become viable, i.e., accrue, when the damages actually occur." *Cruden,* 957 F.2d at 977.

Defendants argue that Plaintiff did not suffer an injury which would justify the return of the full amount of her premiums under RICO. Defendants note that MetLife was bound on the policies and did not refuse to honor them, and thus contend that Plaintiff suffered no injury. Case law does indicate that a plaintiff who is fraudulently induced to enter into a transaction does not suffer injury within the meaning of § 1964(c) until the defendant fails to perform—that is, until it becomes clear that the plaintiff will not get the benefit of the bargain. For example, in *Gelt, supra,* plaintiff creditor alleged that defendant borrower fraudulently induced plaintiff to make loans by misrepresenting the value of collateral. *Gelt,* 27 F.3d at 765–66. The Second Circuit held that plaintiff suffered no actual RICO injury because plaintiff had not yet attempted to foreclose on the loans. *Id.* at 768–69. The court explained why such a claimed loss is not ripe under RICO:

> In determining fraud damages, any amount recovered by the fraudulently induced lender necessarily reduces the damages that can be claimed as a result of the fraud. Because the fraud defendant is not liable for all losses that may occur, but only for those actually suffered, only after the lender has exhausted the bargained-for remedies available to it can the lender assert that it was damaged by the fraud, and then only to the extent of the deficiency. [Plaintiff] does not allege actual injury by simply claiming that it incurred additional risk of loss as a consequence of the fraud.

*Id.* at 768. In *Rohland v. Syn–Fuel Associates,* 879 F.Supp. 322 (S.D.N.Y.1995), plaintiffs claimed that they were induced to enter into an investment based on misrepresentations as to tax benefits. *Id.* at 328. Judge Kram, in determining accrual of plaintiffs' RICO claims for statute of limitations purposes, held that plaintiffs' injuries occurred not when plaintiffs purchased their investments, but rather when the tax court ruled that plaintiffs were not entitled to the benefits which defendants had promised. *Id.* at 332. Judge Kram reasoned that the claimed loss was speculative and unprovable until the tax court declared that plaintiffs would not in

fact receive the full benefit which they expected. *See id.* Similarly, in *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir.1988), the court held that a creditor could not recover for an unpaid debt under RICO. *Id.* at 1106. The court reasoned that the loss was speculative and uncertain until bankruptcy proceedings were complete. *Id.; see also Commercial Union,* 17 F.3d at 612–13 (holding that aggrieved investors suffered no RICO injury, because a reorganization gave them full recovery of their investments); *Stochastic Decisions, Inc. v. DiDomenico,* 995 F.2d 1158, 1165–66 (2d Cir.1993) (holding that judgment creditor could not recover amount due on judgment under RICO, because collection efforts had not been exhausted).

Based on these precedents, it is clear that Plaintiff has not suffered a RICO injury tantamount to the full amount of her premiums. Plaintiff does not allege that MetLife refused to honor her policies. Hence, Plaintiff's actual loss was speculative in this respect. As long as MetLife continued to honor the policies, Plaintiff received at least a portion of what she bargained for—the expectation that MetLife would pay out if she had a claim.

 Plaintiff argues that she did not receive what she expected because her policies were tainted by the alleged fraud and illegality, and thus the policies were riskier than she bargained for. However, claims of mental or emotional distress are not cognizable under § 1964(c). *See Genty v. Resolution Trust Corp.,* 937 F.2d 899, 918–19 (3d Cir.1991); *Berg v. First State Ins. Co.,* 915 F.2d 460, 464 (9th Cir.1990). Thus, Plaintiff cannot assert a RICO injury based on the lost peace of mind which she may have suffered upon learning of the alleged illegality of MetLife's sales. *See Berg,* 915 F.2d at 464 (indicating that RICO does not permit recovery for lost peace of mind). Simply put,

Plaintiff cannot recover under RICO by alleging that she was induced to enter into a transaction which was riskier than she originally believed. *See Gelt,* 27 F.3d at 768 (stating that "[plaintiff] does not allege actual injury by simply claiming that it incurred additional risk of loss as a consequence of the fraud."); *Commercial Union,* 17 F.3d at 609 (stating that "plaintiffs ... may have feared they would suffer harm, but they actually suffered no out-of-pocket loss since their investments were fully repaid ... Thus ... plaintiffs can prove no damages."); *Berg,* 915 F.2d at 464 (holding that termination of plaintiffs' liability insurance caused no RICO injury, where plaintiffs suffered no loss other than distress from risk of being sued while not insured). Plaintiff would have suffered a loss equal to the full amount of her premiums only if MetLife had in fact failed to pay out on her policies.[7]

 A similar conclusion must be reached with respect to Plaintiff's claim for the lack of guaranty fund protection. The guaranty fund would only become relevant upon MetLife's insolvency, a future event whose occurrence is speculative. Hence, Plaintiff suffered no current financial loss caused by the alleged lack of guaranty fund protection.

 However, there are some respects in which Plaintiff has alleged a present RICO injury. In particular, Plaintiff has alleged a present RICO injury based on her claims concerning the New York franchise tax and the failure to provide permanent local service representatives. Taking Plaintiff's allegations as true, these represent current RICO injuries because Plaintiff was fraudulently induced to pay a portion of her premiums toward these items, but did not receive what she bargained for—the tax was not paid, and the local representatives were terminated.[8]

---

7. Plaintiff does not cite any authorities which warrant a contrary conclusion. In the cases primarily relied on by Plaintiff, a clear and definite injury had already been incurred. *See, e.g., Aetna Cas. & Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1552 (1st Cir.1994) (plaintiff insurer fraudulently induced to pay out on false claims); *Hellenic Lines, Ltd. v. O'Hearn,* 523 F.Supp. 244, 248 (S.D.N.Y.1981) (plaintiff fraudulently induced to pay for services never rendered).

8. Defendants argue that the franchise tax was charged to MetLife and not passed on to Plaintiff, and that no part of Plaintiff's premiums was allocated toward service representatives. However, Plaintiff alleges that her premiums included a charge for both the tax and the service representatives. We must take these allegations as true for purposes of this motion. At a future stage of the proceedings we may assess whether Plaintiff's premiums were actually affected by the

Payment for services not rendered is a clear and definite RICO injury. *Hellenic Lines*, 523 F.Supp. at 248. These injuries are not speculative or unprovable, because MetLife has already failed to pay the franchise tax and to provide permanent local representatives.[9]

██ In sum, Plaintiff did not suffer a RICO injury tantamount to the full amount of her premiums, because MetLife did not refuse to pay out on a claim, and hence Plaintiff to this extent received what she paid for. However, RICO would permit Plaintiff to recover that amount of her premiums, if any, which was allocated toward the franchise tax and the local representatives, because Plaintiff did not receive the benefit of the bargain in these respects.

We thus conclude that Plaintiff has alleged some loss which is cognizable under § 1964(c).[10]

### 3. § 1962(c)

Defendants argue that Plaintiff has failed to state a claim for a violation under §§ 1962(a), (b), (c), or (d). We address § 1962(c) first.

Defendants move to dismiss the § 1962(c)[11] claim on the ground that Plaintiff has failed to plead an "enterprise"[12] which is distinct from Defendants. The alleged enterprise consists of the following: (1) Defendants; (2) the United States Army–Europe (USAREUR); (3) the United States Air Force–Europe (USAFE); (4) MetLife's underwriters; (5) doctors and paramedicals who performed medical examinations in Europe; (6) Equifax Services, Inc., which conducted phone interviews of prospective customers; (7) Federal Express, which shipped documents and medical specimens; (8) Old Stone Bank in Warwick, Rhode Island, which accepted wire transfers of premium payments; (9) the Bank of Scotland, which debited policyholders' accounts in the United Kingdom; and (10) various legal advisors who aided in structuring the enterprise. RICO Stmt. at 48–49.

██ A § 1962(c) claim exists only if the alleged enterprise is distinct from the "person" (the defendant). *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30

---

alleged promise of permanent service representatives or the franchise tax.

Defendants also argue that no injury resulted from the termination of the local representatives because Plaintiff could still obtain service from MetLife by other means. However, this does not change the fact that Plaintiff allegedly paid a portion of her premiums for permanent representative service, which Defendants failed to provide.

We note that Plaintiff cannot recover for the inconvenience, annoyance, or distress caused by the termination of the service representatives. As discussed, such mental injuries are not recoverable under RICO. Plaintiff can only recover that amount of her premiums, if any, which was allocated to the service representatives.

9. As discussed in a subsequent section of this Opinion, we conclude that Plaintiff cannot assert a breach of contract claim based on the failure to provide local service representatives, because such promise was not contained in the policies themselves, which contain a merger clause. We note here that such conclusion does not bar Plaintiff from asserting a fraud-based RICO claim if she can establish that MetLife made a promise of permanent service representatives somewhere other than in the contract, and that she paid a part of her premiums for such service, which was not received.

10. Because we conclude that Plaintiff has alleged a cognizable RICO injury with respect to the franchise tax and the local representatives, we need not consider Plaintiff's other claimed element of loss, which is the cost of replacement insurance. This is a motion to dismiss, and we thus do not purport to define the precise extent of damages which will ultimately be recoverable in this action. For the time being, we determine only that Plaintiff has pleaded facts which, if proved, would permit recovery under RICO for that amount of her premiums allocated to the franchise tax and the alleged promise to provide permanent local representatives.

11. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

12 ."Enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

F.3d 339, 343–44 (2d Cir.1994); *Bennett v. United States Trust Co. of N.Y.*, 770 F.2d 308, 315 (2d Cir.1985). This distinctness requirement is not satisfied where the alleged enterprise consists of a corporate defendant (the "person") associated with its own employees or agents carrying on the regular affairs of the corporation. *Riverwoods*, 30 F.3d at 344. Thus, courts have dismissed § 1962(c) claims where the alleged enterprise consists of nothing more than agents or employees of the defendant corporation. *See, e.g., Riverwoods*, 30 F.3d at 344–45 (enterprise consisting of defendant bank and its employees); *Brittingham v. Mobil Corp.*, 943 F.2d 297, 300–02 (3d Cir.1991) (enterprise consisting of defendant corporation, its subsidiary, and an advertising agency representing the corporation); *Odishelidze v. Aetna Life & Cas. Co.*, 853 F.2d 21, 23–24 (1st Cir.1988) (enterprise consisting of defendant insurance company and its subsidiaries and employees). However, a single entity simultaneously can be both the person and one of a number of members of the enterprise—a § 1962(c) claim is stated where the defendant corporation "associates with others to form an enterprise that is sufficiently distinct from itself." *Riverwoods*, 30 F.3d at 344; *Cullen v. Margiotta*, 811 F.2d 698, 729–30 (2d Cir. 1987). Thus, while the enterprise and the person cannot completely overlap, partial overlap is permitted. *Riverwoods*, 30 F.3d at 344.

■ Applying these principles, we conclude that Plaintiff has alleged an enterprise distinct from Defendants. It is true that many of the members of the alleged enterprise apparently were agents carrying out the ordinary business of MetLife, such as Federal Express, the medical examiners, and Equifax.[13] However, the alleged enterprise also included USAREUR and USAFE, which were not "agents" of MetLife. Defendants argue that Plaintiff should not be permitted to avoid the distinctness requirement by including governmental entities in the enterprise, reasoning that such a course would permit any plaintiff to avoid the requirement simply by naming regulatory authorities as members of the enterprise. However, courts have held that an enterprise can include a governmental entity. *See United States v. Freeman*, 6 F.3d 586, 597 (9th Cir.1993); *United States v. Angelilli*, 660 F.2d 23, 30–35 (2d Cir.1981). Furthermore, Plaintiff's allegations demonstrate that USAREUR and USAFE were not in the position of ordinary regulatory entities. Rather, Plaintiff alleges that MetLife entered into an affirmative agreement with USAREUR and USAFE to permit MetLife to sell policies to military personnel in Europe. RICO Stmt. at 49–50, 60. Plaintiff alleges that USAREUR and USAFE thus provided a "legitimate front" to disguise MetLife's illegal sales of policies. *Id.* at 56. Plaintiff alleges that MetLife representatives worked out of military bases, and that MetLife deceived the military by not informing it that MetLife intended to sell policies to non-military personnel. *Id.* at 62, 69. This appears to be the type of usurpation of a legitimate enterprise at which RICO was directed. *See Riverwoods*, 30 F.3d at 344 (noting that the enterprise may be a passive victim of the defendant's racketeering activity).

We thus conclude that Plaintiff has adequately pled the existence of an enterprise distinct from Defendants.[14]

### 4. §§ 1962(a) and (b)

Defendants contend that Plaintiff's claims under §§ 1962(a) and (b) should be dismissed because Plaintiff has failed to plead the requisite "investment injury" under § 1962(a) and the requisite "acquisition injury" under § 1962(b). Because the analysis of these

---

**13.** Plaintiff argues that these entities were not carrying on the regular business of MetLife because MetLife's Overseas Operation was conducted outside the insurance laws of Europe and the United States. However, various courts have held that the illegal nature of an agent's activities does not of necessity render those activities distinct from the corporation's regular business. *See, e.g., R.C.M. Executive Gallery Corp. v. Rols*

*Capital Co.*, 901 F.Supp. 630, 640–41 (S.D.N.Y. 1995); *Langley v. American Bank of Wis.*, 738 F.Supp. 1232, 1241 (E.D.Wis.1990).

**14.** We may of course revisit the enterprise issue at a later stage upon further factual development as to MetLife's relationship with the alleged enterprise members.

concepts is similar, we address them together.

■ To state a claim under § 1962(a),[15] a plaintiff must allege an injury by reason of the defendant's use or investment of racketeering income in an enterprise. *Ouaknine v. MacFarlane,* 897 F.2d 75, 82–83 (2d Cir. 1990). It is not sufficient merely to allege an injury caused by the predicate acts of racketeering themselves. *Id.* The rationale for this "investment injury" requirement is that the essence of a § 1962(a) violation is not the commission of predicate acts, but rather the investment of racketeering income. *Id.* This is in contrast to § 1962(c), whose essence is the commission of predicate acts in connection with conducting the affairs of an enterprise. *Id.* Thus, a plaintiff who is injured solely as a result of predicate acts may sue only under § 1962(c); § 1962(a) is limited to those plaintiffs who can show a distinct injury caused not by predicate acts, but by the use or investment of racketeering income. *Lightning Lube. Inc. v. Witco Corp.,* 4 F.3d 1153, 1188–89 (3d Cir.1993); *Danielsen v. Burnside–Ott Aviation Training Ctr., Inc.,* 941 F.2d 1220, 1229–30 (D.C.Cir.1991).

■ Similarly, to state a claim under § 1962(b),[16] a plaintiff must allege an injury by reason of the defendant's acquisition or maintenance of an interest in or control of an enterprise. *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1062–63 (2d Cir.1996). As with § 1962(a), it is not sufficient merely to allege an injury caused by the predicate acts themselves. *Id.; Lightning Lube,* 4 F.3d at 1190–91. The rationale for this "acquisition injury" requirement is analogous to that of the investment injury requirement of § 1962(a)—the essence of a § 1962(b) violation is not the commission of predicate acts, but rather the acquisition or maintenance of an interest in or control of an enterprise. *See Lightning Lube,* 4 F.3d at 1190–91; *Danielsen,* 941 F.2d at 1230–31. Thus, a plaintiff cannot recover under § 1962(b) unless he alleges a distinct injury caused not by predicate acts but by the defendant's acquisition or maintenance of an interest in or control of an enterprise. *See Discon,* 93 F.3d at 1062–63.

■ We conclude that Plaintiff has alleged injuries caused solely by the predicate acts themselves, and has failed to allege any distinct injury caused by Defendants' use or investment of racketeering income in the alleged enterprise or by Defendants' acquisition or maintenance of an interest in or control of the enterprise. Plaintiff alleges that she was induced to purchase MetLife policies based on Defendants' fraudulent representations and omissions with respect to the legality of the policies, the provision of local service representatives, the payment of the New York franchise tax, and the availability of guaranty fund protection. The alleged predicate acts which made up the pattern of racketeering activity consisted of the various instances of false representation made by means of mail and wire, as well as the transportation of proceeds in the form of premiums acquired through the alleged fraud. RICO Stmt. at 24–46. Thus, it is apparent that all of Plaintiff's alleged injuries occurred by reason of the predicate acts, with Plaintiff's § 1962(c) claim encompassing all of her alleged injuries. *Id.* at 66–67 (asserting § 1962(c) claim based on fraudulent inducement, which caused injury to Plaintiff in the form of premiums paid, overcharge for franchise tax and local representatives, and cost of replacement insurance).

■ Plaintiff attempts to salvage her claims under §§ 1962(a) and (b) by engaging

---

**15.** § 1962(a) provides in pertinent part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

**16.** 1962(b) provides:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

in a form of circular reasoning which has been rejected by prior courts. As to § 1962(a), Plaintiff alleges that Defendants took the proceeds of the enterprise (the premiums obtained from policy sales) and reinvested them into the enterprise to cover the costs of the enterprise's operation, including the recruitment and training of sales representatives and the payment of commission overrides and salaries to MetLife employees. *Id.* at 59–60, 68–69. Plaintiff also alleges that her policies contained a "reinvestment" feature in which policy dividends were automatically applied toward premium payments, and that this feature was an enticement which lead her to purchase her policies. *Id.* at 68–69. Plaintiff thus argues that Defendants reinvested the proceeds in the enterprise in order to sustain the enterprise, thus allowing the enterprise to continue to injure Plaintiff and other MetLife customers. This argument has been rejected by courts as an obvious attempt to avoid the investment injury requirement:

> [W]e have recognized repeatedly that this type of allegation—that the use and investment of racketeering income keeps the defendant alive so that it may continue to injure plaintiff—is insufficient to meet the injury requirement of section 1962(a). In such situations, we have held that the fact that a plaintiff claims that the injury allegedly perpetrated on it would not have occurred without the investment of funds from the initial racketeering activity does not change the fact the plaintiff's alleged injury stems from the pattern of racketeering, and not from the investment of funds by the defendant.

*Lightning Lube*, 4 F.3d at 1188; *see also R.C.M.*, 901 F.Supp. at 642 (holding that allegation that defendants' investment of income enabled defendants to continue their fraudulent behavior did not satisfy investment injury requirement); *Update Traffic Sys., Inc. v. Gould*, 857 F.Supp. 274, 282–83 (E.D.N.Y.1994) (stating that "th[e] invest-

ment-injury requirement is not satisfied merely because the defendant/enterprise has reinvested money from the racketeering acts back into its own operations, thus enabling the scheme to continue."); *Dayton Monetary Assocs. v. Donaldson, Lufkin, & Jenrette Secs. Corp.*, No. 91 Civ.2050(LLS), 1993 WL 410503, at *3 (S.D.N.Y. Oct.14, 1993) (stating that "[p]laintiffs' allegation that the investment of racketeering income created and sustained the enterprises by providing funding and 'the appearance of legitimacy' is insufficient."). As discussed, all of Plaintiff's injuries stemmed from the alleged predicate acts of fraudulent inducement. The reinvestment of proceeds simply allowed the alleged enterprise to continue operating, and thus continue causing injury to Plaintiff and other MetLife customers through further predicate acts of fraudulent inducement.[17] Thus, Plaintiff has alleged injury stemming solely from the predicate acts, and her § 1962(a) claim must be dismissed. *See Brittingham*, 943 F.2d at 303–05 (concluding that plaintiffs had been injured solely by predicate acts of misrepresentation, and thus failed to allege a distinct investment injury); *Ouaknine*, 897 F.2d at 82–83 (same).

■ Plaintiff raises a similar argument with respect to § 1962(b). Plaintiff asserts that Defendants acquired an interest in the enterprise by reaching an agreement with USAREUR and USAFE pursuant to which MetLife received authorization to sell policies to military personnel in Europe. RICO Stmt. at 60, 62. Plaintiff alleges that Defendants maintained this interest in the enterprise by relocating offices, changing procedures, and terminating local representatives, all in order to avoid detection by regulatory authorities. *Id.* at 60. Plaintiff thus alleges that USAREUR and USAFE provided a "legitimate front" which enabled Defendants to solicit and sell policies in Europe. *Id.* at 62, 69–70. Plaintiff bolsters these allegations by asserting that the termination of the local

---

**17.** Plaintiff alleges that the automatic dividend reinvestment feature directly injured her because it was a feature which helped induce her to purchase her policies—hence, Plaintiff claims that this was an injury caused by an investment. However, this allegation does not satisfy the investment injury requirement. This allegation

simply restates the main thrust of Plaintiff's complaint—fraudulent inducement to purchase MetLife policies. The predicate acts of racketeering are alleged to be the fraudulent representations and omissions which induced Plaintiff to purchase. Thus, Plaintiff has not alleged any injury distinct from the fraudulent inducement.

representatives, allegedly done to avoid detection by authorities and thus to maintain MetLife's interest in the enterprise, served to injure Plaintiff by eliminating local representative service. *Id.* at 70.

However, as with Plaintiff's § 1962(a) assertions, these allegations are circular and therefore deficient. Plaintiff is merely alleging that Defendants' relationship with USAREUR and USAFE sustained the enterprise so that Defendants could continue injuring Plaintiff and other · customers through predicate acts of fraudulent inducement. Thus, Plaintiff's § 1962(b) claim must be dismissed for the same reason as her § 1962(a) claim—Plaintiff has failed to plead any injury distinct from that which was caused by the predicate acts themselves.[18] *See Lightning Lube,* 4 F.3d at 1191 (holding that allegation failed to state § 1962(b) claim because it "merely parrots the same injury that section 1962(c) is meant to remedy.").

5. § 1962(d)

Defendants contend that Plaintiff has failed to plead a conspiracy under § 1962(d),[19] arguing that Plaintiff has failed to allege that all Defendants understood the scope of the enterprise and knowingly agreed to further its affairs through the commission of predicate acts.

■■■■■ To state a claim under § 1962(d), a plaintiff must allege facts indicating the existence of an agreement involving each of the defendants to commit two or more predicate acts, as well as facts indicating that each defendant understood the scope of the enterprise and was aware that the acts were part of a pattern of racketeering activity. *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25–26 (2d Cir.1990). Plaintiff has met this standard. Plaintiff alleges that Defendants reached an agreement to commit predicate acts of fraud, and that Defendants were aware of the alleged fraudulent nature of the representations and omissions. RICO Stmt. at 5, 10, 11–20. Furthermore, Plaintiff sets forth the role which each Defendant played in the conspiracy. *Id.* at 11–20. Plaintiff's allegations describe in detail a fraudulent scheme of vast proportions. Taking these allegations as true, there are sufficient facts to support an inference that all Defendants understood the scope of the scheme and agreed to further it. Plaintiff has thus stated a valid § 1962(d) claim.

6. Pleading fraud with particularity

Defendants contend that Plaintiff has failed to plead the alleged predicate acts of fraud with the degree of particularity required by Federal Rule of Civil Procedure 9(b).[20] In particular, Defendants contend that Plaintiff has failed to identify adequately the time, participants, and content of the alleged fraudulent representations, and that Plaintiff has failed to plead facts giving rise

---

**18.** Plaintiff cites two cases which have taken the *opposite approach,* upholding claims under §§ 1962(a) and (b) where the plaintiff merely alleged that the defendant's investment or acquisition of an interest in an enterprise served to sustain the enterprise so that the defendant could harm the plaintiff through further predicate acts. *See Pinski v. Adelman,* No. 94 C 5784, 1995 WL 669101 (N.D.Ill. Nov.7, 1995); *Long Island Lighting Co. v. General Elec. Co.,* 712 F.Supp. 292 (E.D.N.Y.1989). These cases are clearly against the weight of authority, and we therefore decline to follow them.

Plaintiff also cites cases in which the defendants invested income derived from a *prior* pattern of racketeering activity involving *prior* victims into the current enterprise. Several courts have held that the investment injury requirement is satisfied in such cases, because the plaintiff is injured not by the prior predicate acts which generated the income, but rather by the investment of that past income into the current enter-

prise. *See, e.g., Newmyer v. Philatelic Leasing, Ltd.,* 888 F.2d 385 (6th Cir.1989). The Sixth Circuit has recognized that *Newmyer* is inapplicable where the defendant reinvests proceeds generated from the *current* pattern of racketeering activity into the current enterprise. *See Vemco, Inc. v. Camardella,* 23 F.3d 129 (6th Cir. 1994). *Newmyer* is inapplicable in this action because Defendants are alleged to have reinvested proceeds generated from their *current* pattern of racketeering activity.

**19.** § 1962(d) provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

**20.** Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

to an inference of fraudulent intent on the part of each Defendant.

The particularity requirement of Rule 9(b) has three purposes: (1) to provide defendants with fair notice of claims made against them; (2) to protect defendants' reputations from "improvident charges of wrongdoing"; and (3) to protect defendants from strike suits. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995). The first sentence of Rule 9(b), which requires that the circumstances constituting fraud be stated with particularity, has been interpreted to require a plaintiff to do the following: (1) specify the statements which are alleged to be fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127–28 (2d Cir. 1994). The second sentence of Rule 9(b) permits mental state to be pleaded generally. Nevertheless, the Second Circuit has made clear that a plaintiff does not satisfy Rule 9(b) through mere speculation or conclusory allegations—rather, a plaintiff must allege facts giving rise to a "strong inference of fraudulent intent" on the part of each defendant. *Acito*, 47 F.3d at 52; *Shields*, 25 F.3d at 1128. The requisite "strong inference" can be established in one of two ways: (1) by alleging facts which show that the defendant had both the motive and the opportunity to commit fraud; or (2) by alleging facts which constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Acito*, 47 F.3d at 52.

We conclude that Plaintiff has adequately specified the circumstances constituting the alleged fraudulent acts so as to satisfy the particularity requirement of Rule 9(b). Plaintiff specifies the nature and content of the alleged misrepresentations by alleging that Defendants made false and misleading statements as to the legality of the insurance policies, the provision of permanent local service representatives, the New York franchise tax, and the fact that the policies were "as good as" policies sold in New York, and Plaintiff alleges why those statements were in fact false or misleading. RICO Stmt. at 5–9. Plaintiff adequately specifies the time, place, and speaker of the alleged misrepresentations. Plaintiff specifies the means of communication as telephone marketing, mailings, face-to-face sales presentations, advertisements in specific publications, premium notices, pamphlets, letters, and the like. *Id.* at 28, 31–32, 35, 37–38. Plaintiff describes the process by which Defendants recruited sales agents (seventeen of whom are named in Plaintiff's RICO Statement) and trained them to convey false and misleading information. *Id.* at 28. Plaintiff also details specific fraudulent communications on specific dates allegedly made by Defendant Athanassiades and by MetLife sales representatives Hall and Cular. *Id.* at 32–35.

Of course, Plaintiff has not identified the specific time, place, and speaker of every false statement made during the course of the alleged decades-long scheme. This is not fatal to Plaintiff's complaint. It is well-established that a plaintiff may plead on information and belief when facts are peculiarly within the defendant's knowledge, so long as the plaintiff alleges the facts on which such belief is based. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). Clearly, the precise time, place, and speaker of the many false statements allegedly made by MetLife personnel from 1957 to 1995 are matters peculiarly within MetLife's knowledge. *See, e.g., DiVittorio*, 822 F.2d at 1248 (stating that pleading on information and belief is permissible in shareholder derivative suits "in which the complaining stockholders know little of the ways in which the corporation's internal affairs are conducted."); *In re Bausch & Lomb Secs. Litig.*, 941 F.Supp. 1352, 1361 (W.D.N.Y.1996) (stating that " '[w]e are reluctant to punish the plaintiffs for their ignorance of a specific factual detail, as long as defendants have adequate notice of why they are being sued and are capable of preparing a responsive pleading.' " (quoting *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 681 (6th Cir.1988))). Plaintiff cannot be expected to possess more specific information than she has already set forth as to the exact time, place, and speaker of statements made by MetLife personnel.

We also conclude that Plaintiff has adequately alleged circumstances giving rise to an inference of fraudulent intent. Plaintiff alleges ample facts to support an inference that Defendants had consciousness of wrongdoing, or were at least reckless as to the fraudulent nature of the company's conduct. Plaintiff alleges that Defendants routinely changed issuing and placing procedures, and relocated the offices of the Overseas Operation at least four times, all in order to avoid detection by European regulatory authorities. RICO Stmt. at 47. Plaintiff alleges that Defendants were put on notice of the illegality of their insurance sales by correspondence from local sales representatives and their attorneys since 1990, by the 1989 arrest of a MetLife sales representative in Switzerland, and by various other enforcement actions undertaken by European authorities, including an investigation in Great Britain. *Id.* at 54. Furthermore, Plaintiff alleges that MetLife has for many years sold policies in various foreign countries outside of Europe in full compliance with the laws of those countries, thus raising the inference that MetLife was aware that its procedures in Europe were not in compliance with applicable legal requirements. *Id.*

Finally, we conclude that Plaintiff has adequately linked each of the individual Defendants to the alleged fraudulent scheme. It is well established that the mere fact that an individual is affiliated with a defendant corporation does not satisfy Rule 9(b)'s pleading requirements as to that individual. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993). Rather, a plaintiff must allege facts sufficient to create an inference that each individual defendant knew of or participated in the fraud. *Id.; see also DiVittorio*, 822 F.2d at 1247 (stating that the complaint "should inform each defendant of the nature of his alleged participation in the fraud."); *Landy v. Mitchell Petroleum Tech. Corp.*, 734 F.Supp. 608, 621 (S.D.N.Y.1990) (stating that a plaintiff satisfies Rule 9(b) as to defendant controlling persons where plaintiff avers that they had knowledge of the illegal conduct). We conclude that Plaintiff's allegations are sufficient to permit an inference that all of the individual Defendants had knowledge of or participated in the fraud. Plaintiff thoroughly describes a large, decades-long scheme, setting forth the role which Defendants played in that scheme. For many of the individual Defendants, Plaintiff is extremely precise as to the role played. RICO Stmt. at 11–20. For example, Plaintiff alleges that several specific Defendants participated in the relocation of the Overseas Operation's offices and the changing of procedures, all in order to avoid detection by insurance authorities, and that several specific Defendants prepared New York State tax returns which concealed the nature of the overseas sales. *Id.* For some of the Defendants, Plaintiff has not been so specific. For example, as to Defendants Brewster and Cannatella, Plaintiff simply alleges that these individuals "knowingly managed, operated, maintained and conducted the illegal fraudulent activities of the Overseas Operations." *Id.* at 15. However, given the immense nature of the fraudulent scheme which Plaintiff alleges, we conclude that an allegation of this nature, in combination with the other alleged facts, is sufficient to satisfy Rule 9(b). Plaintiff has thoroughly described the precise activities of the Overseas Operation which are alleged to have been unlawful, hence Defendants such as Brewster and Cannatella, who allegedly participated in managing the Operation, are put on adequate notice of the nature of Plaintiff's claims against them. Plaintiff cannot be expected to plead the precise details of every Defendant's role in the scheme, for such information is peculiarly within Defendants' knowledge. *See Bausch & Lomb*, 941 F.Supp. at 1360–62 (concluding that plaintiff could not be expected to plead specific information about when and how directors became aware of misstatement of sales figures). Rather, it is sufficient that Plaintiff has pled the existence of a large fraudulent scheme—a scheme so large that the inference unavoidably arises that the individual Defendants, all of whom were MetLife personnel, were aware of or participated in it.

The same reasoning holds true for those individual Defendants who sat on MetLife's Board of Directors. *See* RICO Stmt. at 20. Plaintiff alleges that these Defendants sat on various committees, including the Audit and

Legal and Social Responsibility Committees. *Id.* This creates an inference that these Defendants were aware of the illegality of MetLife's alleged conduct, especially in light of facts such as the arrest of a MetLife agent in Switzerland and the British investigation, events which must have put MetLife on notice of the possible illegality of its insurance sales. *See, e.g., Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989) (holding that plaintiff satisfied Rule 9(b) where facts gave rise to strong inference that individuals, as directors of corporation, were aware of import restrictions which were not disclosed to plaintiff); *Hallet v. Li & Fung, Ltd.,* No. 95 Civ. 8917(JSM), 1996 WL 487952, at *4 (S.D.N.Y. Aug.27, 1996) (holding that plaintiff satisfied Rule 9(b) as to individual director where director sat on board committees and had access to financial information, thus creating strong inference that director was aware of misrepresentations); *Bausch & Lomb,* 941 F.Supp. at 1361–62 (holding that plaintiff satisfied Rule 9(b) as to individual officers where corporation received information about declining distributorship sales, thus creating strong inference that officers were aware of scheme to hide corporation's declining growth).

We thus conclude that Plaintiff has satisfied Rule 9(b) as against all Defendants.

## C. *State Law Claims*

### 1. Governing law

As an initial matter, we must determine which jurisdiction's law applies to Plaintiff's various state law claims. Plaintiff contends that the law of Switzerland should govern, while Defendants contend that the law of New York should govern.

In determining which law governs, we must apply the choice of law rules of the state of New York. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 137 (2d Cir.1991) (stating that a federal court sitting in diversity must apply the choice of law rules of the forum state). Under New York's choice of law analysis, the jurisdiction with the most significant interest in or contacts with the particular dispute is the jurisdiction whose law is

applied. For claims sounding in contract, New York uses a "grouping of contacts" or "center of gravity" approach, which determines which jurisdiction has the most significant relationship to the transaction at issue. *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 612, 642 N.E.2d 1065, 1068 (1994). For claims sounding in tort, New York uses an "interest analysis," which determines which jurisdiction has the greatest concern with the issues involved in the litigation. *Id.* 618 N.Y.S.2d at 613, 642 N.E.2d at 1069.

The first step in conflicts analysis is to determine whether there is an actual conflict between the laws of the jurisdictions involved. *In re Arbitration between Allstate Ins. Co. and Kathleen Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936, 937 (1993). We conclude that Plaintiff, the proponent of Swiss law, has at this stage of the litigation failed to demonstrate that Swiss law differs from New York law, and we therefore cannot accept Plaintiff's invitation to apply Swiss law. Plaintiff presents a declaration from a practicing Swiss attorney which states that Plaintiff's policies would be voidable on the basis of fraud and "essential error" under Swiss law, and that Plaintiff would be entitled to a refund of her premiums. *See* Mudry Decl. ¶¶ 2–14. Defendants present the declaration of a Swiss professor of law which states in conclusory fashion that Plaintiff's policies would be "fully valid and enforceable" under Swiss law. *See* Kuhn Decl. ¶¶ 2–7. These declarations do not satisfy us that Swiss law differs from New York law. It has been held that a court may choose to apply the law of the forum state where the parties have not adequately advised the court of foreign law. *See, e.g., Gehling v. St. George Univ. Sch. of Med.,* 698 F.Supp. 419, 422 (E.D.N.Y.1988) (applying New York law where parties' submissions as to Grenadian law were inadequate); *McNall v. Tatham,* 676 F.Supp. 987, 990 (C.D.Cal. 1987) (stating that "neither [party] has carried its burden of briefing the Court on the Brazilian law of contract formation and enforceability. For purposes of this motion, then, the Court will assume that the law of Brazil is the same as the law of California.");

*In re Weiss–Wolf, Inc.*, 60 B.R. 969, 982 n. 23 (Bankr.S.D.N.Y.1986) (stating that "[i]n the absence of being directed to controlling principles of Israeli law, the court may choose, as it does here, to apply the laws of the State of New York.").

Plaintiff has made no attempt to identify any material conflict between New York law and Swiss law. Indeed, Plaintiff argues that New York law and Swiss law are precisely the *same* regarding the voidability of insurance contracts. In light of Plaintiff's position, we find it unnecessary at this stage of the litigation to apply conflicts analysis to determine if Switzerland has the greater interest in or connection to the events at issue. *See Rolnick v. El Al Israel Airlines, Ltd.*, 551 F.Supp. 261, 264 n. 2 (E.D.N.Y.1982) (stating that "a plaintiff who wishes to invoke the law of a foreign jurisdiction is charged with the responsibility of providing the court with information sufficient to determine the content of the foreign law."). As is more fully discussed in subsequent sections of this Opinion, see *infra* at 532–544, we conclude that Plaintiff has stated a claim for rescission under New York law. Taking as true the characterization of Swiss law provided by Plaintiff's expert, we find no conflict between New York law and Swiss law as to whether Plaintiff has stated a claim for rescission. Thus, we have been directed to no conflict between New York law and Swiss law which is relevant at this stage of the litigation.

A central point of contention in this lawsuit is the question whether upon rescission of an insurance policy the insured is entitled to a full return of premiums, or whether the insurer is entitled to retain a sum equal to the value of the insurance coverage which the insured enjoyed during the time the policy was in effect. The parties' submissions do not enable us to reach a reasoned conclusion as to whether New York law and Swiss law differ on this issue. As discussed in a subsequent section of this Opinion, see *infra* at 538–540, we conclude that under New York law the insurer is entitled to retain a sum representing the value of the insurance coverage enjoyed by the insured. Plaintiff's Swiss law expert states that Plaintiff would be entitled to "return of the premiums paid" under Swiss law, Mudry Decl. ¶ 12, but does not give thorough consideration to the issue of deducting the value of insurance coverage under Swiss law.[21] We are therefore faced with an inadequate presentation of Swiss law on this point, and hence we cannot assess whether New York law and Swiss law conflict. Having been directed to no precise conflict between Swiss law and New York law on this issue, we will apply New York law. However, we grant Plaintiff the opportunity to make a future submission as to the provisions of Swiss law regarding this issue.[22] If such future submission convinces us that Swiss law permits the insured to recover the full amount of premiums without allowance for the value of past insurance coverage, we will consider revisiting the conflicts issue at that time.

## 2. Forum non conveniens

Defendants request that we dismiss this action on forum non conveniens grounds in the event that we find Swiss law applicable. Even if we were to find Swiss law applicable, however, we would decline to exercise our discretion to grant a dismissal.

The doctrine of forum non conveniens allows a district court to dismiss an action in favor of an adequate alternative forum if such dismissal would serve the convenience of the parties and the ends of justice. *Peregrine Myanmar, Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir.1996); *Murray v. British*

---

**21.** Plaintiff's expert states that upon rescission an insured is entitled to "return of the premiums paid," but devotes no discussion to the issue of allowance for the value of insurance coverage received by the insured. Plaintiff's expert also states that upon rescission "[t]he considerations already paid over by the parties must be returned," Mudry Decl. ¶ 8, thus indicating that Swiss law may give credence to an insurer's request to retain a sum representing the value of insurance coverage received by the insured while the policy was in effect. We thus have inadequate material to make a reasoned determination as to how Swiss law would handle this question.

**22.** *See* Federal Rule of Civil Procedure 44.1 advisory committee's note (stating that "the court is free to insist on a complete presentation by counsel [as to foreign law].").

*Broad. Corp.*, 81 F.3d 287, 290 (2d Cir.1996). The decision whether to dismiss lies wholly within the discretion of the district court. *Scottish Air Int'l. Inc. v. British Caledonian Group*, 81 F.3d 1224, 1232 (2d Cir.1996). The first step in the analysis is to determine if there is an adequate alternative forum. *Peregrine*, 89 F.3d at 46. The second step involves the weighing of several public and private considerations, as set forth by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). We address only the second step, for we conclude that the weighing of the various factors indicates that dismissal in favor of a European tribunal is not warranted.

■■■ The relevant public interest factors to be considered include the following: administrative difficulties flowing from court congestion; the local interest in having local disputes decided at home; the interest in having the trial in a forum that is familiar with the governing law; the avoidance of unnecessary problems in conflict of laws or in interpretation of foreign law; and the unfairness of imposing the burden of jury duty on citizens in an unrelated forum. *Murray*, 81 F.3d at 293. The relevant private interest factors to be considered include the following: the relative ease of access to sources of proof; the availability of process to obtain attendance of unwilling witnesses; the cost of obtaining attendance of willing witnesses; and all other practical concerns that make trials easy, expeditious, and inexpensive. *Id.* at 294. When applying these factors, we must keep in mind that a plaintiff's choice of forum "should not lightly be disturbed." *Scottish Air*, 81 F.3d at 1232. Although the deference to be accorded to the plaintiff's choice of forum is somewhat less where the plaintiff is not a resident of the forum state, a foreign plaintiff's choice of forum is still accorded "some weight." *Murray*, 81 F.3d at 290. Furthermore, we note that dismissal under forum non conveniens is "the exception rather than the rule." *Id.*

■■■ The balance of the public and private interest factors indicates that Plaintiff's choice of a New York forum should not be disturbed. As to the public interest factors, it is clear that New York has a substantial interest in resolving this dispute, and thus it would not be unfair to compel New York citizens to serve on a jury in the trial of this action. Plaintiff alleges a vast fraudulent scheme undertaken by employees of MetLife, a large New York-based insurance company. Plaintiff alleges that the scheme was conceived at MetLife's New York headquarters, that the insurance policies were issued in New York, and that the scheme was managed from MetLife's New York headquarters and MetLife offices in Rhode Island and Connecticut. Though various European nations have some interest in this dispute because it involves alleged violations of European law, New York, as the single headquarters of the alleged scheme, also has a great interest. As to the private interest factors, it is clear that the trial of this matter in New York will be expeditious and convenient. Most of the documentary evidence in relation to MetLife's Overseas Operation will undoubtedly be found in MetLife's New York, Rhode Island or Connecticut offices. All of the individual Defendants are residents of the United States, and most reside in New York. Though the Plaintiff and certain witnesses (including former MetLife sales representatives) reside in Europe, a large number of witnesses will undoubtedly come from MetLife's New York headquarters. In short, New York is a proper forum for this litigation.

We therefore decline to dismiss this action for forum non conveniens.

3. Rescission for illegality

Defendants contend that Plaintiff has failed to state a claim under New York law to rescind her policies on the basis of illegality.

Courts have long recognized that agreements made in violation of law are unenforceable. *See Benjamin v. Koeppel*, 85 N.Y.2d 549, 626 N.Y.S.2d 982, 983, 650 N.E.2d 829, 830 (1995); *Lloyd Capital Corp. v. Pat Henchar, Inc.*, 80 N.Y.2d 124, 589 N.Y.S.2d 396, 397, 603 N.E.2d 246, 247 (1992); 22 N.Y. Jur.2d *Contracts* § 195 (1996) (stating that "[a]ny act, promise, or agreement designed or intended to accomplish the furtherance or effectuation of an unlawful purpose is unlawful, and every such promise or agreement is

void and unenforceable."). Thus, the parties to an illegal agreement generally are not permitted to come to court to seek its enforcement. *See* 22 N.Y. Jur.2d *Contracts* § 195 (stating that "the law will not extend its aid to either of the parties [to an illegal agreement] or listen to their complaints against each other, but will leave them where their own acts have left them.").

However, where one of the parties to an illegal contract is innocent of wrongdoing, courts have allowed such party to seek relief in the form of rescission based on the illegal conduct of the other party to the agreement. *See. e.g., Robinson v. Mutual Reserve Life Ins. Co.*, 182 F. 850, 857 (S.D.N.Y.1910) (permitting insureds to rescind policies on ground that insurer violated New Jersey law), *aff'd*, 189 F. 347 (2d Cir.1911); *Atkin v. Hill, Darlington & Grimm*, 15 A.D.2d 362, 224 N.Y.S.2d 553, 554–58 (1962) (permitting stock purchaser to rescind purchase on ground that seller violated New York law), *aff'd*, 12 N.Y.2d 940, 238 N.Y.S.2d 516, 188 N.E.2d 790 (1963); *Barna v. Clifford Country Estates, Inc.*, 143 Misc. 813, 258 N.Y.S. 671, 674–75 (City Ct.1932) (permitting insurance purchaser to rescind policy on ground that seller violated New York law); *see also* 22 N.Y. Jur.2d *Contracts* § 209 (stating that "[w]henever a statute imposes a penalty upon one party and not upon the other ... the innocent party may recover as upon an implied assumpsit against the party prohibited or upon whom the penalty is imposed for any money or property which he has advanced upon such contract."). The reasoning of these authorities was set forth as follows in *Barna* :

> The parties in this case are not in pari delicto. The [defendant] is the party responsible for the contract. It must be conclusively presumed to know that it was doing an illegal act, and it induced the [plaintiff] to enter into the contract of insurance in ignorance of its illegality. The [plaintiff] had a right to presume that the [defendant] had qualified itself to do an insurance business in this state. The guilt of the plaintiff is less culpable than that of the defendant, and, where such fact appears, the courts will aid the injured party

> and restore him as far as possible to his original position.

*Barna,* 258 N.Y.S. at 675 (citation omitted).

These principles are applicable to agreements made in violation of foreign law. *See Rutkin v. Reinfeld*, 229 F.2d 248, 255 (2d Cir.1956) (stating that "if a contract is entered into with a view of violating the laws of another country it is unenforceable even though it does not otherwise contravene the law of the place where it is made or of the forum."); *Hesslein v. Matzner*, 19 N.Y.S.2d 462, 463–64 (City Ct.1940) (holding that contract made in violation of Czechoslovakian law was unenforceable). In cases where foreign law is violated, the *existence* of illegality is to be determined by the local law of the jurisdiction where the illegal act is done, while the *effect* of illegality upon the contractual relationship is to be determined by the law of the jurisdiction which is selected under conflicts analysis. Restatement (Second) of Conflict of Laws § 202 cmt. c (1971). Thus, in this action, the existence of illegality will necessarily be determined by European law, because Europe is the place where MetLife allegedly engaged in the sale of insurance policies without compliance with applicable insurance regulations. The effect of such illegality (i.e. whether rescission is a proper remedy) will be determined under the law of the jurisdiction which is selected under conflicts analysis. As discussed above, at this stage of the litigation that jurisdiction is New York. Thus, taking as true Plaintiff's allegation that MetLife sold policies in violation of European law, we will apply the New York rule allowing an innocent party such as Plaintiff to rescind a contract for illegality.

Defendants contend that Plaintiff's rescission claim falls within an exception to the normal rules governing illegal agreements. This exception was recognized in *John E. Rosasco Creameries, Inc. v. Cohen*, 276 N.Y. 274, 11 N.E.2d 908 (1937). In *Rosasco*, the New York Court of Appeals recognized that a contract made in violation of a statute which is merely malum prohibitum should in certain circumstances be enforceable, even at the behest of the party responsible for violating the law. *Id.* 11 N.E.2d at 909–10. The *Rosasco* court reasoned as follows:

Where contracts which violate statutory provisions are merely malum prohibitum, the general rule [that illegal contracts are unenforceable] does not always apply. If the statute does not provide expressly that its violation will deprive the parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy or appropriate individual punishment, the right to [enforce the contract] will not be denied.

*Id.* at 909. The *Rosasco* court held that a dealer who sold milk to a second dealer could sue to compel payment, even though the seller had failed to obtain a dealer's license as required by law. *Id.* at 908–10. The court noted that the licensing statute did not expressly provide that contracts made by unlicensed dealers would be unenforceable; that the statute was not enacted for purposes of protecting dealers such as the defendant, but rather was enacted to protect the public; that the legislature had prescribed limited misdemeanor punishment for violation of the statute; and that violations of the statute presented little direct danger to the health or morals of the consuming public, in light of the fact that not all milk dealers were required to obtain a license. *Id.* at 910. Thus, the court reasoned that denying unlicensed dealers the ability to enforce contracts would be wholly out of proportion to the requirements of public policy and legislative intent. *Id.* at 909–10.

■ We conclude that the *Rosasco* exception does not preclude Plaintiff from seeking rescission of her policies. Cases interpreting *Rosasco* indicate that its holding should be limited to mere licensing or revenue-raising statutes that do not regulate the actual merits of the transaction at issue. For example, in *Atkin, supra,* the New York Appellate Division held that *Rosasco* did not preclude a purchaser of insurance company stock from rescinding the purchase based on the seller's failure to comply with New York insurance law. *See Atkin,* 224 N.Y.S.2d at 554–58. The insurance statute at issue required firms selling securities of insurance companies to obtain a license to sell such securities, which license was to issue only upon an inquiry by the superintendent of insurance into the financial condition and affairs of the insurer.

*Id.* at 556. The *Atkin* court specifically distinguished *Rosasco,* reasoning that the licensing statute in *Rosasco* did not regulate the merits of milk sales—the statute merely provided a licensing requirement, was not enacted for purposes of protecting dealers who purchased milk, and did not provide directly for inspection of milk in order to protect public health. *Id.* at 557–58. By contrast, the *Atkin* court concluded that the insurance statute before it regulated the merits of securities transactions by mandating an inquiry by the superintendent into the quality of the securities to be purchased. *Id.* The court reasoned:

The proceedings contemplated by the section [of the insurance statute] with respect to a security have a direct bearing on the transaction of its sale and purchase. Grant of a license application means an official and impartial judgment that investment in the security is at least rational. Denial means that a prejudicial investment may well be forestalled. These benefits the Legislature wanted the investor ... to have, whether he wished them or knew of them. Noncompliance with the statute may thus involve a serious deprivation. Restoration of the parties to their original positions seems to us distinctly within the statutory intent and a remedy by no means disproportionate to the offense.

*Id.* at 558.

In short, the *Atkin* court recognized that *Rosasco* should be limited to licensing or revenue-raising statutes whose violation does not directly bear on the merits of a transaction. In such circumstances, refusal to enforce the contract is deemed an unduly harsh remedy, one that would be out of proportion to the level of punishment which the legislature intended. By contrast, where the statute regulates the merits of the transaction, and the innocent party who seeks to avoid enforcement of the contract is a member of the class which the statute was designed to protect, it is in accordance with legislative intent to permit the innocent party to rescind. *See id.* 224 N.Y.S.2d at 557–58; *see also Benjamin,* 626 N.Y.S.2d at 984, 650 N.E.2d at 831 (indicating that *Rosasco* does not apply "where the statute looks beyond

the question of revenue and has for its purpose the protection of public health or morals or the prevention of fraud.") (citation omitted).

This interpretation of *Rosasco* is borne out by other authorities. For example, in *Anabas Export, Ltd. v. Alper Industries, Inc.*, 603 F.Supp. 1275 (S.D.N.Y.1985), the court held that a contract to distribute items bearing the likeness of an individual was unenforceable on the ground of illegality. *Id.* at 1276–77. The court reasoned that the laws which were violated—laws preventing the misappropriation of another's name or likeness—were not mere licensing or revenue-raising laws as in *Rosasco*, but instead were enacted "to protect the moral sensibilities of the community." *Id.* at 1277. In contrast, courts which have applied the *Rosasco* rule have done so in the context of licensing statutes that did not purport to regulate the merits of transactions. *See, e.g., Benjamin*, 626 N.Y.S.2d at 983–85, 650 N.E.2d at 830–32 (holding that attorney's failure to register with state bar authorities did not preclude him from enforcing referral agreement against law firm); *Thistle v. Englert*, 103 A.D.2d 268, 479 N.Y.S.2d 921, 921–24 (1984) (holding that repair shop owner's failure to register his business under motor vehicle statute did not prevent him from collecting payment due on repair contract); *John William Costello Assocs., Inc. v. Standard Metals Corp.*, 121 Misc.2d 282, 465 N.Y.S.2d 382,

386–88 (Sup.Ct.1982) (holding that employment agency's failure to obtain license did not prevent agency from enforcing contract for employee placement), *aff'd*, 99 A.D.2d 227, 472 N.Y.S.2d 325 (1984).[23]

Plaintiff does not allege that MetLife violated mere licensing or revenue-raising statutes during the course of its sales in Europe. Rather, in addition to alleging that MetLife failed to obtain proper authorizations, Plaintiff alleges that MetLife violated European laws which required insurers to do the following: maintain a branch office in the country of each insured's residence; obtain approval of policy language, illustrations, and premium rates; possess assets equal to one-half of a guaranty fund and deposit one-quarter of that fund in Europe as security; maintain solvency margins; submit information as to nature of risks, policy conditions, reinsurance, solvency margins, expenses, premiums, claims, and the like; maintain technical reserves to cover underwriting liabilities; submit financial statements on a periodic basis; and submit to regulatory audits. Am. Compl. ¶ 81. Taking Plaintiff's characterization of these legal requirements as true, Defendants allegedly violated laws designed to regulate the merits and subject matter of insurance transactions.[24] As in *Atkin*, the party seeking to rescind the contract is within the class which the laws were undoubtedly designed to protect—policy

**23.** There is one recent case, cited by Defendants, in which *Rosasco* was applied even though the statute at issue had some effect on the merits of the contract. In *Lloyd Capital, supra,* the New York Court of Appeals held that a creditor could enforce a loan made in violation of Small Business Administration regulations. *Lloyd Capital*, 589 N.Y.S.2d at 397–98, 603 N.E.2d at 247–48. The regulations set a 20.125% interest cap, which the creditor exceeded by charging a 20.75% rate, and the regulations prohibited a commitment fee charged by the creditor. *Id.* 589 N.Y.S.2d at 397, 603 N.E.2d at 247. Citing *Rosasco*, the court reasoned that these violations were merely malum prohibitum, and that denial of the creditor's ability to enforce the loan would be wholly out of proportion to the level of the violations. *Id.* 589 N.Y.S.2d at 397–98, 603 N.E.2d at 247–48.

The *Lloyd Capital* decision is not inconsistent with the other authorities interpreting *Rosasco*,

including *Atkin*. The violations in *Lloyd Capital*, though related to the merits of the transaction, were very small in degree compared to the size of the loan transaction, and hence denial of enforcement would have been disproportionate to the level of the violations. By contrast, in *Atkin*, the violation at issue had a far larger scope, because the securities seller sidestepped an inquiry by the superintendent into the rationality of the entire transaction. As discussed below, we conclude that Defendants' alleged violations of European law are akin to the violation which occurred in *Atkin*. Thus, we conclude that *Lloyd Capital* is inapposite.

**24.** Defendants argue that these legal requirements were merely incidental to the requirement that MetLife obtain proper authorizations to sell in Europe. However, this does not change the fact that these requirements go beyond mere licensing,and extend to the merits of insurance transactions.

owners and prospective policy purchasers.[25] *See* Kuhn Decl. ¶ 6 (stating that the primary aim of Swiss insurance law is the protection of policyholders) As in *Atkin*, the laws at issue were undoubtedly designed to ensure the fairness of transactions by providing "an official and impartial judgment that investment . . . is at least rational."[26] *Atkin*, 224 N.Y.S.2d at 558; *see also Barna*, 258 N.Y.S. at 673 (noting that the basis of insurance regulation is the notion that the insurance business "is concerned with the public welfare and vested with a public interest."). Thus, the remedy of rescission is not disproportionate to the policy goals displayed by these European regulations. We therefore conclude that *Rosasco* and its progeny are inapposite.

 Defendants raise additional arguments against rescission, none of which are meritorious. Relying on another New York Court of Appeals decision, *Schank v. Schuchman*, 212 N.Y. 352, 106 N.E. 127 (1914), Defendants argue that Plaintiff should not be permitted to use this lawsuit as a "sword" to recover monies already paid to MetLife. In *Schank*, the plaintiffs purchased wagons and wagon parts from the defendant, only to discover that the defendant had bribed employees of the plaintiffs who were to inspect the wagons. *Id.* 106 N.E. at 127. The court held that the plaintiffs could not rescind and recover monies paid to the defendant. *Id.* at 127–29. This conclusion was based on the fact that the plaintiffs had "wholly consumed" the benefits of the contract—the wagons and wagon parts had all been used by the plaintiffs to the point of being "worn out or destroyed." *Id.* at 128–29. Thus, the court concluded that "[t]here is nothing at this time for equity to undo." *Id.* at 128. The court reasoned that rescission should not

be available where a plaintiff has received all the benefits of a contract and had "complete enjoyment" of them, for in such circumstances good conscience demands that the defendant keep the money paid to him, despite the illegality. *Id.* at 128–29.

Defendants focus on a particular passage in *Schank* in which the court indicated that, were the roles reversed and the defendant seeking to sue for the price, the court would refuse to entertain the suit under the general rule that an illegal agreement is unenforceable:

> If the defendant were suing the plaintiffs for the price, and the court were to deny him relief, its refusal would not rest upon the ground that it would be against good conscience for him to have the money. The basis of its refusal would rather be that because of his illegal acts the law would leave him where it found him. In this case it finds him in a situation altogether different. He has received the money and the plaintiffs are trying to take it away from him. The law may at times refuse to aid a wrongdoer in getting that which good conscience permits him to receive; it will not for that reason aid another in taking away from him that which good conscience entitles him to retain.

*Id.* at 129. Defendants seek to spin this passage into a general rule that rescission is never available to a plaintiff who seeks to use the remedy as a "sword" to regain monies paid to a defendant. However, *Schank* is by no means so broad—if it were, it would obliterate the entire doctrine of rescission. Rather, the *Schank* rule was meant to apply where the plaintiff has received and consumed the full benefit of the contract, so that it would violate "good conscience" to allow the plaintiff to regain his payments. The

---

**25.** The relevant legislative intent is that of the Swiss legislature, which created the laws allegedly violated by MetLife. At this time, the only indications of Swiss legislative intent which we have available to us are the nature of the insurance regulations as characterized by Plaintiff's amended complaint, as well as the statements of the parties' conflicting Swiss law experts. Based on the nature of the regulations as set forth in the amended complaint, it is evident that the Swiss legislature's primary motive was protection of insurance purchasers. Thus, we can con-

clude that rescission would not be a disproportionate remedy when exercised by a member of this protected class.

**26.** Though the transaction in *Atkin* involved securities, rather than insurance policies, *Atkin* is still directly on point. *Atkin* stands for the general proposition that violation of a statute which is designed to ensure the merits and fairness of a transaction is grounds for rescission by a member of the statute's protected class.

*Schank* court was careful to state that rescission is available in "a great variety of other conditions, where the transaction in one or more of its elements is still executory." *Id.* at 128. Subsequent cases which have applied the *Schank* rule have done so in circumstances where the plaintiff has received the full benefit of the contract, generally in the form of services already performed, thus making it unfeasible or impossible for the transaction to be undone. For example, in *In re Ivan Boesky Securities Litigation,* 825 F.Supp. 623 (S.D.N.Y.1993), *aff'd,* 36 F.3d 255 (2d Cir.1994), the court held that a firm which hired a banker to study a restructuring plan could not rescind and recover fees paid, where the services had already been performed by the banker. *Id.* at 636–37. Citing *Schank,* the court stated that rescission is unavailable where "plaintiff has realized and paid for the full benefit of the contract." *Id.* at 637. The court noted that rescission is available only where it is reasonably feasible to unwind the transaction and return the parties to their pre-contract status. *Id.; see also Sutton v. Ohrbach,* 198 A.D.2d 144, 603 N.Y.S.2d 857, 857 (1993) (holding that purchaser of architectural services could not rescind and recover payments); *Electrovoice Int'l, Inc. v. Sarasohn Adjusting Co., Inc.,* 149 Misc.2d 924, 567 N.Y.S.2d 568, 570 (Sup.Ct.1990) (holding that purchaser of adjusting services could not rescind and recover payments).

We conclude that the action before us does not fall within the *Schank* rule. Plaintiff did not receive and consume the full benefit of her policies. Rather, the policies were still executory because MetLife had not been required to pay out on them. If MetLife had been forced to pay out on the policies, and Plaintiff had received the payments and

"consumed" them, as the plaintiffs in *Schank* had consumed the wagons, then good conscience would prohibit Plaintiff from regaining her premiums. *See Electrovoice,* 567 N.Y.S.2d at 570 (stating that "[t]o allow plaintiffs to obtain the benefit of the services and to recoup the consideration paid therefor is not equitable under all the circumstances."). However, that is not the case. Defendants argue that Plaintiff received the full benefit of the policies because MetLife was at all times bound to pay out in the event that Plaintiff made a claim. However, this does not change the fact that MetLife was not in fact called upon to carry out its contractual duty to pay out—thus, the policies were still executory in a major sense. *See Manning v. Manning,* 97 A.D.2d 910, 470 N.Y.S.2d 744, 747 (1983) (permitting plaintiff to rescind divorce settlement; settlement was still executory because support payments had not been made); *Kuriansky v. Professional Care, Inc.,* 147 Misc.2d 782, 555 N.Y.S.2d 1, 3–4 (Sup.Ct.1990) (holding that *Schank* did not prevent State from recovering payments made on contract for purchase of health care services; services were substandard, and hence State had not received full benefit of the contract, as had the plaintiffs in *Schank* ). It is by no means unfeasible or impossible to unwind the policy transaction at this point in time, nor is it against "good conscience" to permit Plaintiff to maintain an action for rescission.[27]

Finally, Defendants cite several authorities which stand only for the proposition that Plaintiff's policies were enforceable as against *MetLife.* Defendants cite N.Y. Ins. Law § 3103(a) (McKinney 1985), which provides in pertinent part that "any policy of insurance or contract of annuity delivered or

27. This conclusion is consistent with our discussion of RICO injury. Our RICO injury discussion concluded that, because MetLife never refused to honor the policies, Plaintiff did not suffer a current financial loss tantamount to the full amount of her premiums. Our conclusion with respect to *Schank* recognizes that the policies were never fully executed because MetLife was never compelled to pay out; thus, rescission is not barred under the *Schank* doctrine. The consistency flows from the basic difference between damages under RICO and rescission under state law. RICO permits recovery only to the extent that Plaintiff has suffered current pecuniary loss. Thus, Plaintiff can only recover under RICO to the extent that Defendants failed to deliver what Plaintiff paid for. Defendants did not fail to deliver on their promise to pay out on claims, and thus Plaintiff cannot recover for this under RICO. By contrast, under the state law doctrine of rescission, we are not concerned with Plaintiff's pecuniary loss. Rather, as an innocent party, Plaintiff is entitled to rescind for illegality where, as here, the agreement is still executory.

issued for delivery in this state in violation of any of the provisions of this chapter shall be valid and binding *upon the insurer* issuing the same." (emphasis added).[28] Defendants also cite an incontestability clause prohibiting MetLife from challenging the validity of the policies—a clause which is required under N.Y. Ins. Law § 3203(a)(3) (McKinney 1985). In addition, Defendants cite cases indicating that an insurer who engages in illegality cannot seek to avoid liability on a policy, *see, e.g., American Mut. Servs. Corp. v. United States Liab. Ins. Co.,* 293 F.Supp. 1082 (E.D.N.Y.1968), and cases indicating that an incontestability clause prohibits an insurer from avoiding its obligations under a policy, *see, e.g., Simpson v. Phoenix Mut. Life Ins. Co.,* 24 N.Y.2d 262, 299 N.Y.S.2d 835, 247 N.E.2d 655 (1969). Based on these authorities, Defendants argue that Plaintiff's policies were not void, and that Plaintiff received the full benefit of the bargain because MetLife was bound on the policies.

 We conclude that these authorities do not bar Plaintiff's rescission claim. By their terms, § 3103(a) and the incontestability clause prohibit only the insurer from challenging the validity of a policy, and thus have no bearing on the ability of an insured to seek rescission. Similarly, cases holding that an insurer who engages in illegality is not permitted to avoid liability on a policy are inapposite—they do not affect the general rule that an innocent party is entitled to rescind a contract based on illegality. Taken together, these various authorities may establish that an insurance policy issued in violation of law is not *void,* but this does not mean that such a policy is not *voidable* at the option of the innocent insured. Furthermore, as discussed, the fact that MetLife was bound on the policies does not mean that Plaintiff received the full benefit of her policies so as to preclude rescission under the *Schank* doctrine.

We thus conclude that Plaintiff has stated a claim for rescission on the ground of illegality.

 Having reached this conclusion, we must now confront an issue which is of major significance with regard to the economic consequences of this litigation. Defendants argue that upon rescission of an insurance policy by an insured the premiums recovered must be reduced by an amount equal to the value of the insurance protection which the insured in fact enjoyed during the time that the policy was in effect and would have been honored by the insurer had loss occurred. Thus, Defendants contend that Plaintiff has not stated a claim for a full refund upon rescission, but at best has stated a claim for only a partial refund. Plaintiff, in contrast, relies on a 1907 case which holds that upon rescission an insured is entitled to a full refund without reduction. *See Moore v. Mutual Reserve Fund Life Ass'n,* 121 A.D. 335, 106 N.Y.S. 255 (1907).

The *Moore* decision was reached by a court divided three to two. The majority opinion reasoned that when an insured obtains rescission of a life insurance policy before the insurer has been compelled to pay out, the insured has received nothing of value from the insurer, and hence is entitled to recover the full amount of premiums without deduction. The majority reasoned:

> An inquiry into the nature of the contract of insurance shows that it differs from ordinary contracts, in that, even if the insurer is at a definite expense for every outstanding policy, the insured does not receive in the protection given him any benefit at all comparable in definiteness and certainty to its cost to the insurer. The insured "must die to win," so what he really receives in return for his premiums or assessments is a chance that he or his beneficiary may obtain within a certain time a certain amount. An insurance policy is analogous to a lottery ticket. Both may be said to cost those who sell them approximately definite sums, but the buyer in each case obtains in return no such definite quid pro quo, but rather a chance which may or may not amount to anything. And, although this chance may be claimed

28. The parties dispute whether § 3103(a) is applicable in light of its requirement that the policy be "delivered or issued for delivery" in New York. We need not decide this question, because we conclude that § 3103(a) does not bar Plaintiff's rescission claim in any event.

to have an actual computable money value at a particular time, such value entirely lapses with the termination of the policy or the drawing of the lottery ... Accordingly, if one has purchased such a time value, after the expiration of such time, it seems clear that he has never received any actual value, in the ordinary sense of the word, at all. He is really no better off than if he had never made such purchase, and consequently he has nothing whatever of real or actual value which he should return upon rescinding the contract under which it was obtained.

*Id.* 106 N.Y.S. at 259–60. The dissenting opinions, in contrast, reasoned that the status quo doctrine, which requires a rescinding plaintiff to restore to the defendant any value which the plaintiff received under the contract, applies with full force in the insurance context:

> The cost of this policy of insurance to the association, and its value to the insured, can be ascertained by those familiar with insurance nearly as definitely as the value of a barrel of flour. The plaintiff has received all that the contract contemplated he should receive. If he had died during any of the years, we must assume that his estate would have been paid according to the tenor of the policy. He therefore had the full benefit of it, and it would be inequitable and unjust to the other policy holders in this mutual association to require assets belonging to them to be paid over to the plaintiff upon a technicality, when during all the years he has received the full benefit which the association agreed to give him or which he intended to receive.

*Id.* at 266 (Kellogg, J., dissenting).

Subsequent case law indicates that the *Moore* majority was misguided in its characterization of the nature of insurance. A 1933 New York case states in dictum that an insured should not be entitled to "recover back all the premiums paid" upon a repudiation by an insurer, reasoning that "during the continuance of the policy in force the assured had received substantial benefits in the form of the insurance protection afforded by the policy." *See Gilbert v. New York Life Ins. Co.*, 238 A.D. 544, 264 N.Y.S. 610, 617–18 (1933).[29] Though New York courts have not addressed the issue in recent decades, courts in other jurisdictions have indicated that allowance for the value of insurance coverage is appropriate where the policy is voidable at the option of the insured and the insurer is bound on the policy.[30] *See, e.g., Humana Health Care Plans v. Snyder–Gilbert*, 596 N.E.2d 299, 300 (Ind.Ct.App.1992) (stating that full premium refund is improper where insurer has been at risk on the policy); *Sabbagh v. Professional and Bus. Men's Life Ins. Co.*, 79 S.D. 615, 116 N.W.2d 513, 519 (1962) (stating that "a policyholder is not entitled to rescission for fraud and misrepresentation and recovery of premiums paid without deduction for the value of the insurance protection enjoyed by him."). In light of these authorities, we conclude that the reasoning of the *Moore* majority was simply incorrect, and that modern New York courts would decline to follow it. Rescission is an equitable remedy and we are of the opinion that it would be inequitable to permit the insured to have received the benefit of past coverage without cost and to permit the insurer no compensation for the time it was at risk. The *Moore* majority's view of the economics of insurance as perceived in 1907 is not consonant with present concepts. The analogy of an insurance policy to a lottery ticket is a flawed one, for a policyholder receives substantial benefit from the very fact that the insurer is at risk and is bound to pay out on a claim, even if a claim never

**29.** The *Gilbert* court indicated that rescission should be entirely unavailable as a remedy for an insured upon a repudiation by an insurer. However, in light of our conclusion regarding the availability of rescission as a remedy for illegality, we determine that the proper approach should Plaintiff prevail on the merits is to permit rescission and to deduct from the premiums recovered an amount equalling the value of the insurance coverage received by the insured.

**30.** We note that a full refund without deduction would be appropriate in circumstances where a policy is entirely void. Deduction for the value of insurance coverage is appropriate where, as here, the policy would be merely voidable at the option of the insured, so that the insurer was bound and at risk.

arises. The dissenting opinions in Moore therefore represent the proper approach.

This conclusion receives further support from decisions of the United States Supreme Court in the McCarran Act context. As discussed *supra*, a central factor in defining the "business of insurance" for McCarran Act purposes is the transfer of risk from insured to insurer. The Court has recognized that this transfer occurs not when the insurer pays out on a claim, but rather when the policy relationship is entered into:

> Petitioner's argument contains the unspoken premise that the transfer of risk from an insured to his insurer actually takes place not when the contract between those parties is completed, but rather only when the insured's claim is settled. This premise is contrary to the fundamental principle of insurance that the insurance policy defines the scope of risk assumed by the insurer from the insured.

*Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 131, 102 S.Ct. 3002, 3009–10, 73 L.Ed.2d 647 (1982). If the transfer of risk is the "business of insurance," and if such transfer occurs when the policy relationship is entered into, then we must conclude that one who purchases an insurance policy receives some benefit as soon as the policy relationship is created, and thus the value of such benefit should be retained by the insurer upon rescission.

Accordingly, we conclude that Plaintiff has not stated a claim for a full premium refund, but has instead stated a claim only for a partial refund—one which allows for the value of the insurance coverage received by her during the time her policies were in effect.

### 4. Fraud

Defendants contend that Plaintiff has failed to state a claim for rescission or damages on the basis of fraud.

▇▇▇ To establish a fraud claim, a plaintiff must show a material representation of fact by the defendant which was false and known

to be false, made for the purpose of inducing the plaintiff to rely upon it, justifiable reliance by the plaintiff, and injury. *Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370, 1373 (1996). Defendants contend that the alleged misrepresentations specified by Plaintiff are not of a type which can support a fraud claim. Defendants also contend that Plaintiff has failed to allege injury, and that Plaintiff has failed to plead fraud with particularity as against each Defendant.[31]

▇▇▇ We begin by noting that the entitlement of an insured to seek rescission of an insurance policy based on fraud is well-established. Several cases recognize this proposition. *See, e.g., Robinson,* 182 F. at 858 (stating that "[t]he proof satisfies me that [the insured] was induced to insure by false and fraudulent representations imputable to [the insurer]. Therefore he had a right to rescind the contract."); *Moore,* 106 N.Y.S. at 257 (stating that "[i]f, therefore, the issuance of this policy was induced by fraudulent representations on the part of the [insurer], such policy was therefore voidable ab initio at the instance of the [insured]."). The leading treatises also recognize the proposition. *See* 4 George J. Couch et al., Couch on Insurance § 26A:269 (2d rev. ed.1984); 3A John Alan Appleman & Jean Appleman, Insurance Law and Practice § 1833 (1967).

#### a. Nature of misrepresentations

Defendants contend that the misrepresentations alleged by Plaintiff are not of a type which can support a fraud claim under New York law.

▇▇▇ First, Defendants attack Plaintiff's allegation that MetLife misrepresented that it possessed authority to sell policies in Europe and misrepresented that the policies were enforceable. Defendants contend that, because MetLife was at all times bound on the policies, the former misrepresentation was "irrelevant" and the latter "true." We

---

31. Several of Defendants' arguments made in opposition to Plaintiff's claim to rescind for illegality were also raised by Defendants in opposition to Plaintiff's claim to rescind for fraud. These include Defendants' arguments regarding

*Schank* and regarding authorities indicating that the policies are enforceable as against MetLife. Our discussion of these arguments in the context of Plaintiff's claim to rescind for illegality applies equally here.

must reject this contention. Though MetLife may have been bound to honor the policies, this does not change the alleged fact that MetLife was not authorized to sell policies in Europe. The truth and materiality of such allegations are matters to be resolved at a later stage of the litigation.

█ Second, Defendants contend that Plaintiff cannot assert a fraud claim based on alleged misrepresentations as to the provision of permanent local service representatives or the availability of the protections of New York law, such as the guaranty fund. Noting that Plaintiff also asserts a claim for breach of contract based on these representations,[32] Defendants contend that Plaintiff cannot use such representations to support a fraud claim.

It is clear that a fraud claim is not established by simple allegations that the defendant failed to meet its contractual obligations. *See, e.g., Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir.1992) (stating that promissory statements as to what will be done in the future give rise only to a breach of contract claim, not a fraud claim); *Hotel Constructors, Inc. v. Seagrave Corp.*, 574 F.Supp. 384, 387 (S.D.N.Y.1983) (stating that "[a] cause of action for fraud can only be based upon the misrepresentation of a present or past fact. The mere failure to keep contractual promises of future acts will not sustain an action for fraud."); *Brown v. Lockwood*, 76 A.D.2d 721, 432 N.Y.S.2d 186, 194 (1980) (stating that "[m]ere unfulfilled promissory statements as to what will be done in the future are not actionable as fraud and the injured party's remedy is to sue for breach of contract."). However, several decisions of the New York Court of Appeals have held that a promise made with the intention of not performing it is actionable as fraud. *See Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003, 1004 (1986) (stating that a promise made with a preconceived notion of not performing it constitutes a misrepresentation); *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 262–63, 151 N.E.2d 833, 835–36 (1958) (indicating that statement as to

future event is actionable as fraud where speaker was aware at the time of the statement that future event would not occur); *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 716–17, 143 N.E.2d 906, 908 (1957). The rationale was set forth in *Sabo:*

> [W]e think the allegations in the complaint describe a case where a defendant has fraudulently and positively as with personal knowledge stated that something was to be done when he knew all the time it was not to be done and that his representations were false. It is not a case of prophecy and prediction of something which it is merely hoped or expected will occur in the future, but a specific affirmation of an arrangement under which something is to occur, when the party making the affirmation knows perfectly well that no such thing is to occur. Such statements and representations when false are actionable [as fraud]. . . .

*Sabo*, 164 N.Y.S.2d at 717, 143 N.E.2d at 908 (citation omitted). The Second Circuit has followed these Court of Appeals cases. In *Stewart, supra,* the Second Circuit held that the plaintiff stated a fraud claim based on an allegation that the defendant promised her a promotion while at the time having no intention of carrying out the promise. *Stewart,* 976 F.2d at 89. Citing *Sabo,* the Second Circuit concluded that Plaintiff's allegation was an actionable misrepresentation of a present fact. *Id.*

However, several New York decisions have attempted to depart from the *Sabo* rule by holding that a mere conclusory allegation that the defendant did not intend to carry out a promise is insufficient to state a fraud claim. *See, e.g., PI, Inc. v. Quality Prods., Inc.,* 907 F.Supp. 752, 761 (S.D.N.Y.1995) (stating that "[n]umerous Appellate Division decisions have held, however, that a cause of action for fraud cannot exist when the fraud claim arises out of the same facts as a breach of contract claim with the sole additional allegation that the defendant never intended to fulfill its express contractual obligations." (citing cases)); *Sudul v. Computer Outsourcing Servs.,* 868 F.Supp. 59, 62 (S.D.N.Y.1994)

32. Plaintiff's breach of contract claim is dis cussed below.

(stating that plaintiff "should not be allowed to bootstrap a breach of contract claim into a fraud claim by simply including in his complaint an allegation that defendant never intended to · uphold his end of the deal."); *Spellman v. Columbia Manicure Manuf. Co.,* 111 A.D.2d 320, 489 N.Y.S.2d 304, 307–08 (1985) (dismissing fraud claim where plaintiff made simple allegation that defendants never intended to carry out agreement).

We conclude that Plaintiff's allegations regarding the local service representatives and the protections of New York law come within the *Sabo* rule. Plaintiff alleges that MetLife "never intended to honor its commitment to provide local sales representatives," and that MetLife "knew or should have known" that its policies lacked the protection of the New York guaranty fund. Am. Compl. ¶¶ 76, 85. If Plaintiff presented only these conclusory allegations, we would hold that Plaintiff had failed to plead a fraud claim. However, the amended complaint also pleads facts which support an inference that MetLife never intended to carry out its alleged promise to provide permanent local representatives or guaranty fund protection. Plaintiff alleges that from the very beginning of the alleged scheme Defendants sought to avoid compliance with insurance and tax laws by not reporting European sales to New York authorities or paying New York franchise taxes, thus raising an inference that Defendants never intended to make available the protections of New York law. *Id.* ¶¶ 85, 90. Plaintiff also alleges that the termination of the local service representatives came so shortly after Swiss authorities informed MetLife of the illegality of its sales, *id.* ¶¶ 95–106, as to give rise to an inference that from the very beginning MetLife intended to eliminate local service representatives when necessary to avoid detection of its illegal conduct. Thus, we conclude that Plaintiff may be able to prove that MetLife in fact never intended to honor its alleged promise to provide permanent local service representatives. *See Drexel Burnham Lambert, Inc. v. Saxony Heights Realty Assocs.,* 777 F.Supp. 228, 235 (S.D.N.Y.1991) (stating that fraud claim is properly pled where the complaint sets forth "specific facts from which a reasonable trier of fact could directly or indirectly infer that the promisor intended not to honor his obligations at the time the promise was made."); *Hotel Constructors,* 574 F.Supp. at 388 (holding that plaintiff stated fraud claim where facts supported an inference that defendant never intended to carry out its promise); *Brown,* 432 N.Y.S.2d at 194–95 (indicating that *Sabo* rule is applicable where plaintiff presents proof that defendant did not intend to keep its promise; such proof must go beyond the mere fact that defendant did not in fact perform).

▮ Furthermore, a fraudulent inducement claim is not redundant of a contract claim where the fraudulent inducement involves misrepresentations of present facts which are collateral to the contract. *See PI,* 907 F.Supp. at 761 (stating that "[a] cause of action for fraud may be maintained on the basis of allegations that a party made a collateral or extraneous misrepresentation that served as an inducement to the contract."); *Deerfield,* 510 N.Y.S.2d 88, 502 N.E.2d at 1004 (indicating that fraudulent inducement claim was not duplicative of contract claim where it alleged misrepresentation of a present fact "collateral to, but which was the inducement for the contract."). The alleged misrepresentation regarding authorization to sell policies in Europe is certainly a present fact extraneous to the policies. Furthermore, the alleged misrepresentation that the policies were protected by New York law can be read as a misrepresentation of a present collateral fact (the status of the policies at the time of sale) as well as a promise of future action on MetLife's part (ensuring the availability of the protections of New York law). Such misrepresentations can clearly support a fraud claim.

Third, Defendants contend that Plaintiff cannot assert a fraud claim based on the alleged misrepresentations concerning the New York franchise tax. Defendants contend that the tax was levied upon MetLife, not upon Plaintiff. However, at this stage of the litigation, we must accept as true Plaintiff's allegation that the tax was paid by Plaintiff as part of her premiums.

▮ Fourth, Defendants contend that the alleged misrepresentation that Plaintiff's pol-

icies were "as good as" policies available in New York was too vague to be untrue or to have permitted Plaintiff to reasonably rely on it as an indication that her policies were protected by the New York guaranty fund. It is true that a mere expression of opinion is not fraudulent. *See* 60 N.Y. Jur.2d *Fraud and Deceit* § 29 (1987). However, it is also clear that the line between opinion and fact "is sometimes difficult to determine," and may depend on the precise form of the statement, its surrounding circumstances, and the knowledge of the parties at the time. *Id.* § 30. Such factual circumstances must be developed before we can determine whether this type of representation constitutes mere opinion as opposed to a factual representation regarding guaranty fund protection, and whether Plaintiff was entitled to reasonably rely on this representation.[33] Furthermore, at this stage we must accept as true Plaintiff's allegation that her policies in fact lacked guaranty fund protection.

### b. Injury

■ Defendants argue that Plaintiff has failed to allege injury. The injury element of a fraud claim is interpreted differently depending on whether the remedy sought is damages or rescission. An action for damages requires the showing of some concrete pecuniary loss. *Lama Holding*, 646 N.Y.S.2d 76, 668 N.E.2d at 1373, 60 N.Y. Jur.2d *Fraud and Deceit* § 164. By contrast, a substantial body of case law indicates that an action to rescind a contract for fraudulent inducement does not require a showing of injury in the traditional sense which is required in an action for damages. *See, e.g., D'Angelo v. Bob Hastings Oldsmobile, Inc.,*

89 A.D.2d 785, 453 N.Y.S.2d 503, 503 (1982) (stating that "[i]n such an action [rescission], unlike a cause of action in damages on the same ground, proof of ... pecuniary loss is not needed."), *aff'd,* 59 N.Y.2d 773, 464 N.Y.S.2d 724, 451 N.E.2d 471 (1983); *Gross v. State Cooperage Export Crating and Shipping Co.,* 32 A.D.2d 540, 299 N.Y.S.2d 773, 774–75 (1969) (stating that "it is not necessary for a defrauded party to show that he has suffered pecuniary damages in order to obtain rescission."); *Commercial Credit Corp. v. Third & Lafayette Sts. Garage, Inc.,* 226 A.D. 235, 234 N.Y.S. 463, 468–69 (1929) (stating that "this is not an action to recover damages for deceit, but is brought upon a rescission of the contract to recover the consideration paid ... Under these circumstances, appellant was not bound to show that it had suffered pecuniary loss by reason of defendant's fraud."); *see also* 60 N.Y. Jur.2d *Fraud and Deceit* § 165 (stating that "[g]enerally, it is not necessary for a defrauded party to show that he has suffered a pecuniary loss by reason of the fraud in order to obtain rescission of the transaction or contract."). Though a plaintiff seeking rescission on the ground of fraud need not show actual pecuniary loss, he must still show injury in some sense. In particular, such a plaintiff must show that she "received something different from what she contracted for and that she might not have accepted the same had the facts not been misrepresented to her." *Krinsky v. Title Guarantee & Trust Co.,* 163 Misc. 833, 298 N.Y.S. 31, 37 (Sup.Ct.1937); *see also Mott v. Tri–Continental Fin. Corp.,* 330 F.2d 468, 470 (2d Cir.1964) (stating that sufficient injury to warrant rescission is shown where plaintiff

---

**33.** Defendants also contend that the existence of a merger clause in Plaintiff's policies precludes Plaintiff as a matter of law from asserting that she reasonably relied on any extra-contractual representations. However, though the existence of a merger clause is relevant to the issue of reasonable reliance, it is improper to grant a motion to dismiss at this stage of the litigation based on the existence of a boilerplate merger clause. *See, e.g., Chase v. Columbia Nat'l Corp.,* 832 F.Supp. 654, 662 (S.D.N.Y.1993) (holding that general merger clause did not preclude reliance); *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 601–02, 157 N.E.2d 597, 598–99 (1959) (holding that a specific disclaimer

precludes reasonable reliance, but indicating that a "general and vague" merger clause would not preclude fraud claim); *George v. Lumbrazo,* 184 A.D.2d 1050, 584 N.Y.S.2d 704, 705 (1992) (stating that general merger clause is merely one fact for jury to consider on issue of reliance); *Most v. Monti,* 91 A.D.2d 606, 456 N.Y.S.2d 427, 428 (1982) (stating that "[i]t is well established that a general 'boiler-plate' merger clause is ineffective to preclude judicial inquiry into specific allegations of fraud. Neither the merger clause, nor any other provision of the contract of sale, precludes the purchasers from now claiming that they relied upon a misrepresentation by defendant.").

"received something other than that for which he bargained.").

We conclude that Plaintiff has adequately pled injury for purposes of rescission on the basis of fraud. Plaintiff alleges that Defendants made material misrepresentations and omissions concerning the legality of the policies, the New York franchise tax, provision of permanent local service representatives, and guaranty fund protection. Plaintiff alleges that the policies which she received differed from what she expected, in that they were not issued in compliance with European law, the New York franchise tax was not paid, permanent local representatives were not provided, and there was no assurance of guaranty fund protection. Plaintiff alleges that she ceased paying premiums when MetLife refused to provide her with assurances as to the legality of her policies and the availability of guaranty fund protection and local representatives—thus, an inference arises that Plaintiff would not have purchased her policies if she were aware of the true facts. *See, e.g., D'Angelo,* 453 N.Y.S.2d at 503–04 (holding that automobile purchaser was entitled to rescind upon defendant's misrepresentation that automobile was "new" when in fact it was not); *Krinsky,* 298 N.Y.S. at 37–38 (holding that purchaser of mortgage certificate was entitled to rescind upon defendant's misrepresentation as to maturity date—court noted that "[t]here is a material difference between what plaintiff bargained for and what she received."); *Ressler v. Samphimor Holding Corp.,* 201 A.D. 344, 194 N.Y.S. 363, 367–69 (1922) (holding that realty purchaser could rescind upon defendant's misrepresentation as to amount of income which realty would generate).

We also conclude that Plaintiff has adequately pled pecuniary loss so as to state a claim for damages on the basis of fraud. The requirement of pecuniary loss in this regard is similar to the requirement of pecuniary loss under RICO, which is discussed above. We adopt that discussion here, and conclude that Plaintiff has alleged financial loss at least with respect to the New York franchise tax and the local service representatives. As discussed in the RICO context, these represent current financial losses because Plaintiff alleges that she paid a part of her premiums toward these items but did not receive what she paid for—the tax was not paid, and permanent servicing was not provided. *See Hellenic Lines,* 523 F.Supp. at 248 (indicating that payment for services not rendered constitutes pecuniary loss).[34]

c. Pleading fraud with particularity

Finally, we reject Defendants' contention that Plaintiff has failed to plead fraud with particularity. We adopt our discussion of this issue from the RICO portion of the Opinion, *supra.*

We thus conclude that Plaintiff has stated a claim for damages and rescission on the basis of fraud.[35]

5. Breach of contract

Defendants seek dismissal of Plaintiff's breach of contract claim to the extent that it asserts alleged promises to provide permanent local service representatives and guaranty fund protection.

Defendants contend that these alleged promises were not contained in Plaintiff's insurance policies. Defendants thus maintain that Plaintiff's breach of contract claim is barred by N.Y. Ins. Law § 3204(a)(1) (McKinney 1985), which provides that "[e]very policy of life, accident or health insurance . . . delivered or issued for delivery in this

---

**34.** We reject Defendants' argument that Plaintiff suffered no injury because MetLife was bound on the policies. With respect to rescission, the fact that MetLife was bound does not change the fact that Plaintiff was allegedly induced to purchase a policy that was different from what she expected. With respect to damages, the fact that MetLife was bound does not change the fact that Plaintiff allegedly suffered concrete harm in that she paid a part of her premiums for something which she did not receive (payment of the tax and provision of permanent representative service).

**35.** As discussed *supra,* upon rescission for illegality or for fraud, Plaintiff would not be entitled to a full premium refund, but rather would be entitled to a refund which makes allowance for the value of the insurance coverage which Plaintiff received during the time her policies were in effect.

state, shall contain the entire contract between the parties, and nothing shall be incorporated therein by reference to any writing, unless a copy thereof is endorsed upon or attached to the policy or contract when issued." Defendants also contend that Plaintiff's breach of contract claim is barred by a merger clause in the policies themselves, and by the statute of frauds.[36]

The merger clause provides that "[t]his policy includes any riders and, with the application attached when the policy is issued, makes up the entire contract."[37] *See* Roffer Decl. Dated Feb. 7, 1996 Ex. 2. Plaintiff seeks to avoid the effects of this clause by contending that the promises on which her breach of contract claim is based were present within the policies themselves. As to the permanent local representatives, Plaintiff contends that the cover letters which were attached to her policies contained an express promise of personal service. However, the cover letters simply state that MetLife has provided "quality products and personalized service for more than 100 years," and that "we promise to provide you and your family with the kind of quality service we know you expect—now and in the future." *See* Am. Compl. Ex. I. We can conclude as a matter of law that this reference does not rise to the level of a promise to provide permanent local representative service in the future. As to guaranty fund protection, Plaintiff points out that a page of her policies labelled "policy specifications" contains the initials "NY" at the bottom. *See* Am. Compl. Ex. I. Plaintiff reads these initials to constitute a promise that Plaintiff's policies would include the protections provided by New York law, including

the guaranty fund. However, again, we can conclude as a matter of law that this reference does not rise to the level of such a promise.[38]

Accordingly, we dismiss Plaintiff's breach of contract claims as they relate to the promise of permanent local representatives or guaranty fund protection.

### 6. Fiduciary duty and negligent misrepresentation

Defendants contend that Plaintiff has failed to state a claim for breach of fiduciary duty, arguing that there is no such duty running from an insurer to an insured. Defendants raise this same argument as grounds for dismissal of Plaintiff's negligent misrepresentation claim. *See Stewart,* 976 F.2d at 90 (stating that a plaintiff may recover for negligent misrepresentation only where the defendant owes a fiduciary duty).

Defendants cite several cases of ancient vintage, all of which state that the relationship between an insurance company and a policyholder is an ordinary contractual one lacking the elements of trust and confidence which a fiduciary relationship requires. *See Equitable Life Assurance Soc'y of the United States v. Brown,* 213 U.S. 25, 46, 29 S.Ct. 404, 410–11, 53 L.Ed. 682 (1909) (citing New York case law which holds that there is no fiduciary relationship between insurer and insured); *Uhlman v. New York Life Ins. Co.,* 109 N.Y. 421, 17 N.E. 363, 364–65 (1888) (stating that "the relation between the policyholder and the company was one of contract, measured by the terms of the policy."); *Sil-*

---

**36.** The parties dispute whether § 3204(a)(1) is applicable to Plaintiff's policies, in light of the requirement that the policies be "delivered or issued for delivery" in New York. We need not resolve this issue, because we conclude that the merger clause contained in Plaintiff's policies has the same effect as § 3204(a)(1).

**37.** This merger clause was not attached as an exhibit to Plaintiff's amended complaint, but other portions of her policies were so attached. *See* Am. Compl. Ex. I. We may consider the clause on this motion. *See Brass,* 987 F.2d at 150 (stating that on a motion to dismiss the district court may consider "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.").

**38.** Our conclusion that no promises of permanent local service representatives or guaranty fund protection were contained in the policies themselves serves only to bar Plaintiff's contract claim. It does not bar a claim based on fraud or misrepresentation in the event that Plaintiff can establish that representations as to these items were made other than in the contract. *See PI,* 907 F.Supp. at 761 (stating that "[a] cause of action for fraud can be maintained on the basis of allegations that a party made a collateral or extraneous misrepresentation that served as an inducement to the contract.").

*verman v. Pittsburgh Life & Trust Co.*, 176 A.D. 749, 163 N.Y.S. 1011, 1013 (1917) (holding that there is no fiduciary relationship between insurer and insured); *New York Hotel Trades Council v. Prudential Ins. Co. of America*, 1 Misc.2d 245, 144 N.Y.S.2d 303, 308 (Sup.Ct.1955) (stating that "[t]he contracts of insurance do not create any relation between the parties involving or giving rise to any fiduciary obligations. Except as required by statute, insurance companies deal with insureds at arm's length."), *aff'd*, 1 A.D.2d 952, 151 N.Y.S.2d 612 (1956). Defendants also cite two opinions of more recent vintage which follow these older decisions. *See Moll v. U.S. Life Title Ins. Co. of N.Y.*, 654 F.Supp. 1012, 1028–29 (S.D.N.Y.1987); *Rochester Radiology Assocs. v. Aetna Life Ins. Co.*, 616 F.Supp. 985, 988 (W.D.N.Y. 1985).

However, a recent decision of the Eastern District of New York concluded that a jury should be permitted to inquire into the nature of the relationship between an insurer and its insureds to assess whether a relationship of trust and confidence existed. *See United States v. Brennan*, 938 F.Supp. 1111, 1120–21 (E.D.N.Y.1996). *Brennan* did not cite any of the aforementioned cases rejecting the existence of a fiduciary relationship in the insurance context. Rather, *Brennan* followed a line of cases holding that an insurer owes a fiduciary duty to its insured when the insurer is representing the insured in litigation involving third parties. *See Hartford Accident and Indem. Co. v. Michigan Mut. Ins. Co.*, 93 A.D.2d 337, 462 N.Y.S.2d 175, 178 (1983), *aff'd*, 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984). The basis for the fiduciary obligation is quite clear in the litigation context, for the insurer is undertaking to represent the insured's interests. Whether the recognition of a fiduciary obligation in the litigation context opens the door to the recognition of such an obligation in other contexts is not eminently clear. However, at least one New York decision has recognized the possibility of a broader fiduciary relationship. *See Estate of Wheaton, Meagher v. Metropolitan Life Ins. Co.*, 119 Misc.2d 615, 463 N.Y.S.2d 727 (Sup. Ct.1983). *Meagher* involved a situation quite analogous to the one before us. The plaintiff

executor alleged that an agent of the defendant insurance company had fraudulently induced the deceased to purchase a policy. *Id.* at 728. The court held that the plaintiff stated a claim for constructive fraud based on a confidential relationship, concluding that the agent occupied such a superior bargaining position over the elderly purchaser as to permit an inference that a relationship of trust existed. *Id.* The court did not cite or discuss any prior case law refusing to recognize a fiduciary duty between insurer and insured.

■ We cannot ignore the decisions cited by Defendant which indicate that the relationship between insurer and insured is merely arm's-length. However, we also cannot ignore *Meagher*, which recognizes that, under the right circumstances, the relationship between insurer and insured may be imbued with elements of trust and confidence which render the relationship more than a mere arm's-length association. Plaintiff here alleges several facts from which the existence of a relationship of trust and confidence can be inferred. Plaintiff alleges that MetLife reached out to Americans in Europe, including Paul Dornberger, Plaintiff's husband. These Americans were likely concerned with taxes and the relationship between American law and foreign law. Plaintiff alleges that MetLife sought out these Americans through an advertising campaign aimed at assuaging their concerns and promising personalized service to handle questions and problems. *See* Am. Compl. ¶ 64 and Ex. H; RICO Stmt. at 37–38. Such indications of a relationship closer than arm's-length were apparently absent in the aforementioned decisions which refused to recognize a fiduciary relationship between insurers and insureds. *See Moll*, 654 F.Supp. at 1028 (concluding that insureds failed to plead facts showing any relationship of trust or confidence with insurer). In light of *Meagher*, we believe that New York courts do not follow a per se rule prohibiting the recognition of a fiduciary relationship in the insurance context—rather, New York courts will permit a jury to assess the circumstances of the relationship to determine if it is one of

trust and confidence.[39]

 Defendants also contend that Plaintiff cannot maintain a negligent misrepresentation claim because such a claim would be redundant of Plaintiff's contract claim. The case law is clear that "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987). However, where the plaintiff alleges the breach of a duty separate from the duties owed under the contract itself, a tort claim may lie. *See id.* 521 N.Y.S.2d at 657, 516 N.E.2d at 194 (stating that the duty upon which a tort claim is based "must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract."). Plaintiff's negligent misrepresentation claim does not merely seek to hold Defendants to the promises made in the insurance policies. Rather, as discussed, Plaintiff alleges facts which indicate the existence of a confidential relationship broader than the policies themselves—a relationship which was violated through the use of misrepresentations to induce Plaintiff to purchase policies. *See RKB Enters., Inc. v. Ernst & Young*, 182 A.D.2d 971, 582 N.Y.S.2d 814, 816 (1992) (indicating that a negligent misrepresentation claim would lie between contracting parties if plaintiff alleged facts establishing a fiduciary relationship); *see also Kimmell v. Schaefer*, 224 A.D.2d 217, 637 N.Y.S.2d 147, 149 (holding that investor established negligent misrepresentation claim based on misrepresentations which induced investor to purchase), *aff'd*, 89 N.Y.2d 257, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996).

Accordingly, we reject Defendants' request for dismissal of the fiduciary duty and negligent misrepresentation claims.

### 7. Statutory claims

Defendants seek dismissal of Plaintiff's claims under N.Y. Ins. Law §§ 2123, 4224, and 4226 and N.Y. Gen. Bus. Law § 349.

 As an initial matter, § 2123, whose language refers to "agent[s] or representative[s] of any insurer," applies only to agents or brokers, not to insurers. *See Buccino v. Continental Assurance Co.*, 578 F.Supp. 1518, 1526 (S.D.N.Y.1983); *Standard Sec. Life Ins. Co. of N.Y. v. Bedell*, 113 Misc.2d 259, 448 N.Y.S.2d 995, 996 (Sup.Ct.1982); *Slote v. Equitable Life Assurance Soc'y of the United States*, 78 Misc.2d 462, 356 N.Y.S.2d 812, 813 (Sup.Ct.1974). Rather, § 4226, which explicitly applies to "insurer[s]" and which contains substantially the same prohibitions as § 2123, is applicable to insurers. Hence, Plaintiff's § 2123 claim is dismissed.

 As to § 4224,[40] which is aimed at discrimination between individuals of the same class and life expectancy, Defendants argue that this statute is limited to discrimination against members of "small, insular minority groups" and is therefore inapplicable to Plaintiff. Defendants cite no authority for this proposition, other than two opinions which considered § 4224 in the context of insular minority groups. *See Silver v. Equitable Life Assurance Soc'y of the United States*, 168 A.D.2d 367, 563 N.Y.S.2d 78 (1990) (mental retardation); *Health Ins. Ass'n of America v. Corcoran*, 154 A.D.2d 61, 551 N.Y.S.2d 615 (1990) (HIV status). Neither of these decisions purport to limit § 4224 in the manner which Defendants sug-

---

**39.** A leading treatise states that older decisions which refused to recognize a fiduciary relationship between insurer and insured may now be "out of step with current concepts." 12 John Alan Appleman & Jean Appleman, Insurance Law and Practice § 7004 (1981). The treatise notes that "[p]articularly is this approach outmoded when television advertising repeatedly refers to 'the good hands' of the insurer or how it is 'like a good neighbor', implying an ability to place trust and reliance upon the broad shoulders of the kindly company." *Id.*

**40.** § 4224 provides in pertinent part:

(a) No life insurance company doing business in this state ... shall: (1) make or permit any unfair discrimination between individuals of the same class and of equal expectation of life, in the amount or payment or return of premiums, or rates charged for policies of life insurance or annuity contracts, or in the dividends or other benefits payable thereon, or in any of the terms and conditions thereof.

gest. Our independent research has not disclosed any authority so limiting the statute. Quite the contrary, § 4224 has been applied without any indication that the insured is a member of a discrete minority group. *See, e.g., Metropolitan Life Ins. Co. v. Trilling,* 194 A.D. 178, 184 N.Y.S. 898, 902 (1920) (holding that statutory precursor to § 4224 was violated where insured was permitted to pay a different premium than others in his age group).

▆ As to § 4226,[41] Defendants contend that this statute applies only to misrepresentations regarding dividends or the financial condition of an insurer or comparisons between insurers, and that none of the misrepresentations alleged by Plaintiff are of this type. However, a plain reading of § 4226 does not bear out this contention. It is true that subsections (a)(2), (a)(3), and (a)(4) of § 4226 refer specifically to misrepresentations as to dividends, surplus, and financial condition, and that subsection (a)(5) refers specifically to comparisons between insurance policies. However, subsection (a)(1) is far broader, covering "any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts." This language is certainly broad enough to encompass misrepresentations of the type alleged by Plaintiff.[42]

▆ Finally, Defendants contend that Plaintiff's claims under §§ 4224, 4226, and 349 are time-barred with respect to the policy which was purchased more than three years prior to the filing of the original complaint.[43] Defendants contend that the applicable statute of limitation is the three-year period of N.Y. C.P.L.R. § 214(2) (McKinney 1990), which applies to actions "to recover upon a liability, penalty or forfeiture created or imposed by statute."

Case law does not provide an easy answer. *Buccino, supra,* appears to be the sole reported case dealing with the applicable statute of limitation for claims under § 4226 of the Insurance Law. *See Buccino,* 578 F.Supp. at 1526 (applying § 214(2)'s three-year period). We have been directed to no case law dealing with the applicable limitations period for claims under § 4224 of the Insurance Law. As to § 349 of the General Business Law, the authorities are in conflict. One court has held that claims under § 349 are governed by § 214(2)'s three-year limitations period. *See Domon v. Warsitz,* No. 92–CV–721S, 1993 WL 152079, at *5 (W.D.N.Y. Apr.26, 1993). Another has held that the applicable statute of limitation is the three-year period under N.Y. C.P.L.R. § 214(4) (McKinney 1990), which applies to claims for injury to property. *See Construction Tech., Inc. v. Lockformer Co.,* 704 F.Supp. 1212, 1223 (S.D.N.Y.1989). Most recently, a third court has held that the applicable period is N.Y. C.P.L.R. § 213(8) (McKinney 1990), which provides a six-year period for claims based on fraud. *See Ediciones Quiroga v. Fall River Music, Inc.,* No. 93 Civ. 3914(RPP), 1995 WL 103842, at *7 (S.D.N.Y. Mar.7, 1995).

We are inclined to follow the reasoning of the *Ediciones* court, and we therefore con-

---

**41.** § 4226 provides in pertinent part:

(a) No insurer authorized to do in this state the business of life, or accident and health insurance, or to make annuity contracts shall:
(1) issue or circulate, or cause or permit to be issued or circulated on its behalf, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts;
(2) make any estimate of the dividends or share of surplus or additional amounts to be received on such policies or contracts;
(3) make any false or misleading statement of the dividends or share of surplus or additional amounts paid by any such insurer on similar policies or contracts;
(4) make any misleading representation, or any misrepresentation of the financial condi-

tion of any such insurer or of the legal reserve system upon which it operates; or
(5) make or deliver to any person or persons any incomplete comparison of any such policies or contracts for the purpose of inducing, or tending to induce, such person or persons to lapse, forfeit or surrender any insurance policy or contract.

**42.** Defendants also contend that New York law does not permit class actions to enforce § 4226. This issue will be addressed at the class certification stage.

**43.** Plaintiff purchased two MetLife policies, one in 1991 and one in 1993. Am. Compl. ¶ 4. The original complaint in this action was filed in December, 1995.

clude that the applicable limitations period for Plaintiff's claims under §§ 4224, 4226 and 349 is the six-year period for claims based on fraud.[44] The *Ediciones* court relied on a line of district court decisions holding that claims under § 43(a) of the Lanham Act should be governed by the six-year period applicable to fraud claims. *See Gordon and Breach Science Publishers S.A. v. American Inst. of Physics*, 859 F.Supp. 1521, 1528–29 (S.D.N.Y. 1994); *PepsiCo, Inc. v. Dunlop Tire & Rubber Corp.*, 578 F.Supp. 196, 198–99 (S.D.N.Y. 1984). These cases reasoned that the Lanham Act is aimed at deception and false representations, and thus Lanham Act claims are most analogous to fraud claims. *See Gordon and Breach*, 859 F.Supp. at 1528–29; *PepsiCo*, 578 F.Supp. at 198–99. *Ediciones* reasoned that § 349 of the General Business Law, which prohibits "deceptive acts or practices," is similarly aimed at deception, and hence claims under § 349 are most analogous to fraud claims. *Ediciones*, 1995 WL 103842, at *7. The Second Circuit has recently adopted the reasoning of *Gordon and Breach* and *PepsiCo*, holding that the proper statute of limitation for Lanham Act claims is the six-year period provided under N.Y. C.P.L.R. § 213(8). *See Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191–92 (2d Cir.1996).

We agree with the *Ediciones* court that claims under § 349, like Lanham Act claims, are substantially similar to fraud claims. Plaintiff's claims under §§ 4224 and 4226 of the Insurance Law are also based on alleged fraudulent activities on the part of Defendants. Accordingly, we conclude that the proper limitations period for Plaintiff's claims under these statutes is the six-year period applicable to fraud claims under New York law. Because Plaintiff's policies were purchased within six years of the filing of the original complaint in this action, Plaintiff's claims are not time-barred.

### D. *Personal Jurisdiction*

■ Defendants contend that Plaintiff has failed to allege facts supporting the existence of personal jurisdiction as to ten of the individual defendants.[45] Plaintiff contends that personal jurisdiction over all individual Defendants is established by means of the nationwide service provision for RICO claims, set forth in 18 U.S.C. § 1965.[46]

The district courts of this Circuit have split as to the proper interpretation of § 1965. Some have held that § 1965 automatically bestows a jurisdictional reach encompassing the entire United States, provided that each individual defendant has minimum contacts with the United States. *See, e.g., Ginsburg v. Faragalli*, 776 F.Supp. 806, 808 (S.D.N.Y. 1991). Other courts have read § 1965 more narrowly, holding that the jurisdictional reach of a district court may extend nationwide only where such reach is necessary to satisfy the "ends of justice" language of § 1965(b). *See, e.g., PT United Can Co. v. Crown Cork & Seal Co.*, No. 96 Civ. 3669(JGK), 1997 WL 31194, at *2–*4 (S.D.N.Y. Jan.28, 1997).

We need not take sides in this conflict, for we conclude that the "ends of justice" require that our jurisdictional reach extend nationwide in this action. Though some of the individual Defendants in this case reside outside New York, Plaintiff alleges that all were connected to a vast fraudulent scheme emanating from MetLife's headquarters in New

---

44. More precisely, a fraud claim is timely under New York law if brought within six years of the commission of the fraud, or within two years of the actual or imputed discovery of the fraud, whichever is longer. *See Construction Tech.*, 704 F.Supp. at 1220; N.Y. C.P.L.R. §§ 203(g), 213(8) (McKinney 1990 & Supp.1997).

45. These defendants are: Brewster, Madera, George Slane, Jeffrey Slane, Barnette, Ferre, Keller, Mahoney, Place, and Sneath.

46. § 1965 provides in pertinent part:
 (b) In any action under section 1964 of this chapter in any district court of the United

States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

. . . .

 (d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

York. *See Michaels v. Wildenstein & Co., Inc.,* No. 93 Civ. 8179(MGC), 1995 WL 326497, at *3 (S.D.N.Y. May 31, 1995) (holding that "ends of justice" standard was met where individual defendants located outside New York were alleged to have "conspired with a New York art gallery and its officials to defraud [plaintiff].").

## III.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. We dismiss Plaintiff's claims under 18 U.S.C. §§ 1962(a) and (b). We dismiss Plaintiff's rescission claims to the extent that a full premium refund is sought, but conclude that Plaintiff has stated rescission claims for a partial refund, with allowance to be made for the value of insurance coverage received by the Plaintiff. We dismiss Plaintiff's breach of contract claim to the extent that it is based on alleged promises to provide permanent local service representatives or guaranty fund protection. We dismiss Plaintiff's claim under N.Y. Ins. Law § 2123. We deny Defendants' motion to dismiss for forum non conveniens and Defendants' motion to dismiss for lack of personal jurisdiction.

The Court will schedule a pretrial conference approximately twenty days after the filing of this Opinion to discuss the further progress of this litigation.

SO ORDERED.